ACCENTRA INC., et al., Plaintiffs,

v.

STAPLES, INC., et al., Defendants.

Case No. CV 07–5862 ABC (RZx).

United States District Court,
C.D. California,
Western Division.

Dec. 19, 2011.

Alan C. Chen, Jeffrey Stephen Kravitz, Fox Rothschild LLP, Los Angeles, CA,

Frank T. Carroll, Joseph F. Posillico, Fox Rothschild LLP, Philadelphia, PA, Plaintiffs.

Andrew T. O'Connor, Barbara L. Moore, Cooley Manion Jones LLP, David Cotta, Peter J. Cuomo, Edwards Wildman Palmer LLP, Boston, MA, Bruce G. Chapman, Connolly Bove Lodge & Hutz LLP, Los Angeles, CA, for Defendants.

## ORDER RE: POST–TRIAL MOTIONS

### AUDREY B. COLLINS, Chief Judge.

After the jury trial and verdict in this case, the parties have filed several post-trial motions. The following motions are resolved by this Order: (1) Defendants and Counter-claimants Staples, Inc., and Staples The Office Superstore, LLC's ("Staples") Motion for Judgment as a Matter of Law (Docket No. 487); (2) Plaintiffs and Counter–Defendants Accentra, Inc. and Worktools, Inc.'s ("Accentra's") Motion for Enhanced Damages and Attorney's Fees (Docket No. 492); (3) Accentra's Motion for Permanent Injunction (Docket No. 491); (4) Accentra's Motion for Accounting, Pre- and Post–Judgment Interest, and Costs (Docket No. 490); and (5) Accentra's a Motion for Order re Findings of Fact and Conclusions of Law for Inequitable Conduct (Docket No. 489).[1] The parties each filed oppositions and replies to the motions pursuant to the Court-ordered briefing schedule and the Court heard oral argument on several of the motions May 16, 2011.[2] The parties also filed supplemental briefs on the issues of

indefiniteness and a new trial for damages. The Court rules as follows.

## BACKGROUND[3]

Accentra alleged in this case that Staples willfully infringed three patents owned by Worktools and licensed by Accentra by selling several models of spring-powered staplers, namely, Staples' "Executive One–Touch" stapler (model "EX–5"), its "One–Touch" staplers (models "DX–1" and "CX–1"), and its "One–Touch" 60-sheet "High Capacity" stapler. The patents at issue are U.S. Patent No. 7,178,709 (filed Feb. 24, 2005) (the "'709 patent"); Patent No. 7,080,768 (filed Aug. 23, 2004) (the "'768 patent"); and Patent No. 7,290,-692 (filed Jan. 4, 2007) (the "'692 Patent"). For its part, Staples claimed that it did not infringe any of the patents and, if it did infringe, the patents are invalid; Staples further claimed that the '709 patent is unenforceable due to Accentra's inequitable conduct before the Patent and Trademark Office ("PTO").

Following trial, the jury returned a verdict in Accentra's favor, finding that the accused staplers willfully infringed the asserted claims of Accentra's patents[4], that Accentra had suffered damages as a result of the infringement, and that none of the asserted claims was invalid as obvious or anticipated. (Docket No. 472.) The jury awarded Accentra a total of $2,205,192 in reasonable royalties (rejecting Accentra's claimed lost profits) in the following proportions: $432,658 for infringement by the

---

1. Staples also filed a Motion for Attorney's Fees and Costs related to Accentra's trademark claims. (Docket No. 488.) The Court will decide that motion by separate order.

2. These matters were taken under submission after the hearing to allow further briefing and mediation.

3. The Court includes here only a brief background of the case; the facts have been dis-

cussed in detail in conjunction with the Court's Order denying summary judgment on Accentra's patent claims and need not be repeated except as relevant to the pending motions. (Docket No. 211.)

4. The CX–1, DX–1, and EX–5 stapler models were accused of infringing all three patents-in-suit, but the High Capacity was accused of infringing only the '768 patent and the '692 patent.

CX–1; $676,112 for infringement by the DX–1; $774,684 for infringement by the EX–5; and $321,738 for infringement by the High Capacity. (*Id.* at 12.) The jury further provided advisory findings that Staples failed to prove the factual predicates for inequitable conduct by clear and convincing evidence, namely that named inventor Joel Marks and prosecution attorney Paul Feng withheld material information from the PTO during the prosecution of the '709 patent with the intent to deceive the PTO. (*Id.* at 4.)

The parties now request various types of post-trial relief, and the Court addresses each of those requests below.

## DISCUSSION

### I. STAPLES' MOTION FOR JUDGMENT AS A MATTER OF LAW (Docket No. 487)

Staples moves for judgment as a matter of law on several grounds. First, Staples argues that the asserted claims of the '709 are indefinite, rendering the patent invalid and requiring that the jury's verdict of willful infringement of that patent be set aside. Second, Staples claims that there was insufficient evidence offered at trial for a reasonable jury to conclude that any of the staplers at issue infringed any of the patents-in-suit. Third, Staples argues that insufficient evidence was offered to support the jury's reasonable royalty award. Finally, Staples argues that insufficient evidence was offered for a reasonable jury to find that Staples willfully infringed any of the patents.

As outlined below, the motion is GRANTED IN PART and DENIED IN PART. The Court concludes that the '709 patent is invalid as indefinite, so the jury's verdict of willful infringement of that patent and award of damages must be set aside, which renders moot Staples' alternative argument that insufficient evidence supported the jury's finding of willful in-fringement of the '709 patent. The Court finds, however, that substantial evidence supports the jury's finding of infringement of the '768 and '692 patents. The Court rejects Staples' contention that Accentra's expert's testimony on damages must be excluded, but concludes that the damage award must be reduced as a matter of law because the '709 patent is invalid as indefinite. Finally, the Court concludes that insufficient evidence was offered to support the jury's findings that Staples' infringement of the '768 and '692 patents was willful, so the jury's verdict on those issues must be set aside.

### A. Legal Standard

Once a party has moved pre-verdict for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50(a), Rule 50(b) permits the party to renew that motion following the jury verdict. If properly raised, a Rule 50(b) motion in a patent infringement case is governed by Ninth Circuit law. *Finisar Corp. v. DirecTV Group, Inc.*, 523 F.3d 1323, 1328 (Fed.Cir. 2008). In the Ninth Circuit, "[a] jury's verdict must be upheld if it is supported by substantial evidence." *Wallace v. City of San Diego*, 479 F.3d 616, 624 (9th Cir. 2007). " 'Substantial evidence is evidence adequate to support the jury's conclusion, even if it is also possible to draw a contrary conclusion from the same evidence.' " *Id.* The Court is not permitted to weigh the evidence offered at trial; it must simply "ask whether the plaintiff has presented sufficient evidence to support the jury's conclusion." *Id.* In doing so, the Court must "disregard all evidence favorable to the moving party that the jury is not required to believe" and "[t]he evidence must be viewed in the light most favorable to the nonmoving party, and all reasonable inferences must be drawn in favor of that party." *Id.* In the end, "[j]udgment as a matter of law may be granted only where,

so viewed, the evidence permits only one reasonable conclusion, and that conclusion is contrary to the jury's verdict." *Id.*

## B. Indefiniteness of the '709 Patent

Staples' claim that the '709 patent is indefinite arises in the unusual circumstance here of a post-trial motion for judgment as a matter of law, although Staples raised the same indefiniteness argument at the claim construction stage (Docket No. 58 at 14–23) and at summary judgment (Docket No. 155 at 31). Given this procedural posture, there is some concern that Accentra may be prejudiced by the Court addressing indefiniteness now, so the Court ordered the parties to file supplemental briefs on the issues of indefiniteness and prejudice. The Court concludes that no prejudice would arise from adjudicating indefiniteness following trial and that the '709 patent is, indeed, invalid as indefinite.

### 1. *Prejudice*

■ Indefiniteness is a " 'legal conclusion that is drawn from the court's performance of its duty as the construer of patent claims,' " not a question for the jury. *Datamize, LLC v. Plumtree Software, Inc.,* 417 F.3d 1342, 1347 (Fed.Cir. 2005). As a result, " 'district courts may engage in a rolling claim construction, in which the court revisits and alters its interpretation of the claim terms as its understanding of the technology evolves.' " *Pressure Prods. Med. Supplies, Inc. v. Greatbatch Ltd.,* 599 F.3d 1308, 1316 (Fed. Cir.2010). In *Pressure Products,* for example, the court approved the district court's further construction of claims during trial because the court, and not the jury, had the obligation to resolve disputes over claim construction, even though they arose during trial. *Id.* Moreover, trial testimony educated the court on the proper construction of the claims, and the patentee was not prejudiced because it had the

opportunity to adjust to the claim construction during trial. *Id.* at 1315–16.

■ There is even less of a risk of prejudice to Accentra here than there was in *Pressure Products.* Unlike *Pressure Products,* where the court was concerned about prejudice from adopting a different claim construction, finding claims indefinite is not a matter of adopting a different construction in the midst (or after) trial to which the patentee needs to adjust, but a matter of concluding that no construction of the disputed claims is possible. If the risk of prejudice was not enough to prevent the court in *Pressure Products* from adopting a different construction during trial, then the risk of prejudice to Accentra in finding the claims indefinite is largely nonexistent.

Even if prejudice could arise in this circumstance, Accentra has not shown that it has. First, Staples has repeatedly raised the indefiniteness of the '709 patent, most recently in the parties' Pre–Trial Conference Order (Docket No. 411 at 9) and at the pre-trial conference (Cuomo Supp. Decl., Ex. 6 (Pre–Trial Conf. Tr.) at 10–13), so Accentra can claim no unfair surprise from Staples raising the issue again after trial. Second, Accentra was permitted to present its infringement case to a jury, so ruling now that the '709 patent is indefinite would simply reverse the parties' positions on appeal, and if the Federal Circuit reverses the Court's indefiniteness ruling, it can reinstate the jury's verdict as to the '709 patent. Indeed, Staples may have been more prejudiced than Accentra, as it was forced to trial to defend against claims of infringement of a patent that the Court now concludes is invalid as indefinite. Thus, there is no prejudice that would preclude addressing indefiniteness now.

## 2. *Indefiniteness*

The definiteness requirement appears in 35 U.S.C. § 112, ¶ 2: "The specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention." "Because the claims perform the fundamental function of delineating the scope of the invention ... the purpose of the definiteness requirement is to ensure that the claims delineate the scope of the invention using language that adequately notifies the public of the patentee's right to exclude." *Datamize,* 417 F.3d at 1347. In the face of indefinite claims, "competitors cannot avoid infringement, defeating the public notice function of patent claims." *Halliburton Energy Servs., Inc. v. M–I LLC,* 514 F.3d 1244, 1249 (Fed.Cir.2008). Definiteness does not command "absolute clarity" in the claim terms, but only enough clarity that "those terms can be given any reasonable meaning," and "[o]nly claims 'not amenable to construction' or 'insolubly ambiguous' are indefinite." *Datamize,* 417 F.3d at 1347. A claim raising difficult issues "does not *ipso facto* result in a holding of indefiniteness"; " '[i]f the meaning of the claim is discernible, even though the task may be formidable and the conclusion may be one over which reasonable persons will disagree,' " it is not invalid as indefinite. *Id.*

An issued patent is subject to a presumption of validity in the face of a claim of indefiniteness, *id.,* and an infringer must prove by clear and convincing evidence that "a skilled artisan could not discern the boundaries of the claim based on the claim language, the specification, and the prosecution history, as well as her knowledge of the relevant art area." *Halliburton,* 514 F.3d at 1249–50. In determining indefiniteness, general principles of claim construction apply; thus, the Court relies primarily on intrinsic evidence, such as the claim language itself, the patent specification, and the file history. *Datamize,* 417 F.3d at 1348. The Court may also consider extrinsic evidence, such as expert testimony, keeping in mind that " 'what matters is for the court to attach the appropriate weight to be assigned to those sources in light of the statutes and policies that inform patent law.' " *Id.*

The issue here involves the claims in the '709 patent covering a "pressing area" "near" the front end of the handle that, in claims 24, 25, and 28, moves "about 0.9 to 1 inch" as the handle moves from the "rest position" to the "pre-release position," and in claim 27, moves "about double" the distance the striker moves from the "rest position" to the "pre-release position." (Cuomo Decl., Ex. 1 ('709 Patent) col. 18, ll. 15–18, 36–38, col. 19, ll. 5–10, col. 20, ll. 1–4.) In order to determine infringement, then, one must identify the pressing area according to the measurements in the claims to determine whether it travels the required distance and is "near" the front end of the handle.

At claim construction, Staples contended that there were at least two valid ways to measure the handle travel distance, either vertically on an axis perpendicular to the base, or point-to-point, and because there was no way for a person of ordinary skill to determine which measurement was warranted to identify the pressing area, the claim was indefinite. (Docket No. 58 at 18.)[5] Staples alternatively argued that, if the Court were to reject its indefiniteness argument, the Court should adopt a construction that would make the pressing area "as small as possible to permit one of ordinary skill in the art to determine the

---

**5.** Staples offered a third way, in an "arc" as the handle rotates on a pivot. The Court did not address that measurement method at claim construction.

scope of the claims." (Docket No. 58 at 15.) [6]

The Court rejected Staples' indefiniteness argument and construed the term "pressing area" to call for both methods of measurement of handle travel. The Court further found that the method that produced the "smaller" pressing area was the method to be used to determine placement of the pressing area on the handle. Thus, the pressing area was construed as follows:

> "Pressing area" means "the surface area on the handle which moves about 0.9 to 1 inch toward the base as the handle moves from the rest position to the pre-release position, measured by whichever creates a smaller area of (a.) the distance traveled along an axis perpendicular to the base or (b.) the straight line distance traveled by a point between the two positions."

(Docket No. 87 at 29.) Despite the Court's attempt to construe the claims in the '709 patent to provide a workable way to measure the handle travel at the pressing area, it has become clear that the claims are "insolubly ambiguous" because there is no way to determine the proper method to measure the handle travel distance and no claim construction could provide that answer.

The inability to determine which method of measurement to use is critical to definiteness because the method used can determine whether the pressing area is "near" the front end of the handle and whether an accused stapler has a handle that moves the required distance at the pressing area. For example, Novak testified at his deposition that the pressing area on the EX–5 accused stapler created by using the point-to-point measurement method was not "near a front end of the handle," whereas the pressing area creating by using the vertical measurement method was. (Trial Tr. at 71–74 (Day 2 Afternoon).) Although he contradicted himself at trial when he testified that the pressing area on the EX–5 produced by both measurement methods was "near" the front end of the handle and the jury was entitled to disregard this impeachment in deciding the factual issues of anticipation, obviousness, and infringement, this still suggests that the method of measurement could very well determine whether a device is covered by the claims in the '709 patent.

Perhaps more important, the method of measurement proved outcome-determinative at summary judgment on the issue of invalidity. In moving for summary judgment, Staples argued that the prior art EasyShot stapler invalidated the '709 patent because it had a pressing area in a nearly identical place as the accused staplers, when comparing the EasyShot's point-to-point pressing area to the CX–1's point-to-point pressing area; the same was true with the vertical measurements. (Docket No. 155 at 29.) [7] Accentra defeat-

---

**6.** The Court rejects Accentra's argument that, by offering this alternative argument, Staples should be estopped from challenging the Court's prior claim construction on indefiniteness grounds. Staples merely offered a possible claim construction in the event that the Court disagreed with its position that the claims were indefinite. Staples is not now adopting a "clearly inconsistent position" that would allow it to derive an "unfair advantage" at this stage. *See Transclean Corp. v. Jiffy Lube Int'l, Inc.,* 474 F.3d 1298, 1307 (Fed.Cir.2007) (holding that judicial estoppel applies to claim construction if, *inter alia,* the new position was "clearly inconsistent" with the prior position and the party changing positions would derive an "unfair advantage" if not estopped).

**7.** Staples' theory was that, because the pressing areas were essentially the same on the accused staplers and the prior art EasyShot stapler, either the accused devices did not infringe or the EasyShot invalidated the '709 patent. The Court concluded that this was a fact question for the jury.

ed summary judgment on this point by arguing that, consistent with the Court's construction of the claims over handle travel distance, the relevant comparison was the pressing area on the CX–1 produced by the vertical measurement method (which produced the smaller pressing area) and the pressing area on the EasyShot produced by the point-to-point measurement method (which produced the smaller pressing area). (Docket No. 175 at 12–13.) When the pressing areas were compared in this way, there was at least a jury question whether the pressing area on the EasyShot was not near the front end of the handle, while the pressing area on the CX–1 was. (Docket No. 211 at 27–31.) Although arguably consistent with the Court's claim construction at the time, this approach demonstrates that the method of measurement could very well determine whether a person skilled in the art was practicing the invention disclosed in the '709 patent or merely practicing the prior art.[8]

There is nothing in the claims language or specification to suggest the proper method of measuring the handle travel distance.[9] The claims language prescribes only the travel distance of the pressing area on the handle ("0.9 to 1 inch" and "about double"), and the specification refers to the pressing area in only two places, neither of which discusses how the pressing area should be measured. (Cuomo Decl., Ex. 1 ('709 Patent), col. 1, 11. 51–54, col. 6, 11. 54–56.)[10] Likewise, at trial, the parties' experts agreed that both methods were legitimate ways to measure handle travel in order to determine the location of the pressing area. (Trial Tr. at 70 (Day 2 Afternoon); Trial Tr. at 73 (Day 5 Afternoon).)

Tellingly, Accentra points to no intrinsic evidence to suggest that one method of measurement is required over any others. Instead, Accentra now argues—for the first time—that the proper construction of the claims covering handle travel distance call for the point-to-point measurement, pointing first to a single comment by its expert Novak at trial that, despite admitting that there are two legitimate ways to measure handle travel, "[t]here may be a scientific basis that I personally would favor the point to point." (Trial Tr. at 70–71 (Day 2 Afternoon).) Accentra has now submitted an entirely new declaration from Novak in conjunction with its supplemental brief, in which Novak conceded that "there is no intrinsic or extrinsic evidence that would indicate to a person of ordinary skill in the art which of at least two possible methods of measurement is required to measure the handle travel distance, or that would support the construc-

---

8. Accentra's successful argument on this issue at summary judgment suggests that it should be estopped now from arguing that only the point-to-point measurement is valid. *See Transclean*, 474 F.3d at 1307. Nevertheless, because the Court's claim construction at least arguably supported Accentra's approach, estoppel is not warranted.

9. Accentra has also pointed to nothing in the prosecution history that sheds any light on how to measure the handle travel.

10. In the first reference, the specification explains that the handle and the striker in the covered spring-powered stapler can be de-

linked, so, "[f]or example, the handle, where it is pressed near its front end, may move downward one inch as the spring is deflected, while the striker moves just 1/2 inch when the spring is released." (Cuomo Decl., Ex. 1 ('709 Patent), col. 1, ll. 51–54.) The second reference explains that the handle in the illustrated embodiment "moves downward at its front end about 0.9 inch," which is "approximately double that possible with a direct action stapler where the handle is directly linked to the striker," and which "provides additional leverage to deflect the spring 90, thus allowing reduced handle force." (*Id.* at col. 6, ll. 54–60.)

tion that a person of ordinary skill in the art would use the smaller pressing area produced by those methods to place the pressing area on the handle." (Novak Decl. ¶ 5.) He nevertheless opines that the point-to-point measurement is the only proper measure because it "is the only type of measurement that can be used in assessing infringement of the asserted claims." (*Id.* ¶ 6.)

There are several reasons why Accentra's evolving interpretation of the '709 patent does not support a construction to render the claims definite. First, Novak's testimony at trial carries little weight at claim construction because Novak's own preference of the point-to-point method over the vertical method is not probative of how a person skilled in the art would have understood how to measure handle travel. *See Symantec Corp. v. Computer Assocs. Int'l, Inc.*, 522 F.3d 1279, 1290–91 (Fed. Cir.2008) (finding expert testimony did not support limited claim construction of "computer" and "computer system" because "[t]hat testimony simply recites how each expert would construe the term 'computer system' based on his own reading of the specification," and "[s]uch expert testimony, which does not identify the 'accepted meaning in the field' to one skilled in the art, is unhelpful."); *Sinorgchem Co., Shandong v. Int'l Trade Comm'n*, 511 F.3d 1132, 1137 n. 3 (Fed.Cir.2007) (according "little or no weight" to expert testimony of meaning of term because the experts "did not identify any evidence that those skilled in the art would recognize [the disputed term], or any term used in the specification, has an accepted meaning in the field of chemistry."); *see also Gen. Protecht Group, Inc. v. Int'l Trade Comm'n*, 619 F.3d 1303, 1310–11 (Fed.Cir.2010) ("None of the experts identified a particular meaning in the art, and an expert's subjective understanding of a patent term is irrelevant." (citing *Symantec* and *Sinorgchem* )).

■ Second, Novak's new testimony must be disregarded because it is procedurally improper. Unsurprisingly, Staples vehemently objects to the Court considering this new evidence at this stage, and rightly so. (Docket No. 523.) As the Federal Circuit "has repeatedly explained, 'litigants waive their right to present new claim construction disputes if they are raised for the first time after trial.' " *Lazare Kaplan Int'l, Inc. v. Photoscribe Techs., Inc.*, 628 F.3d 1359, 1376 (Fed.Cir. 2010) (citing *Broadcom Corp. v. Qualcomm Inc.*, 543 F.3d 683, 694 (Fed.Cir. 2008)). As noted above, Staples raised the indefiniteness of the handle travel limitation at the claim construction stage and Accentra did not urge the Court to construe the claims to require a particular method of measurement. Instead, Accentra defended against indefiniteness at the claim construction stage simply by arguing that no construction of any of the terms in the '709 patent was necessary (Docket No. 57 at 19, 22) and that Staples' expert's vertical and point-to-point measurements of the handle travel distance yielded differing results of the location of the pressing area that amounted only to a "rounding error," suggesting that the method of measurement made no difference to the claims (Docket No. 69 at 23). And adopting a new claim construction now would prejudice Staples, which had no opportunity to defend against Accentra's proposed construction at trial (or by cross-examining Novak on his new opinions). *See Pressure Prods.*, 599 F.3d at 1315–16.

Third, even if Novak's new testimony is not procedurally improper, like his trial testimony, it lends little support to Accentra's claim that a person skilled in the art of stapler design would know to use only the point-to-point method to measure the handle travel distance as disclosed in the '709 patent. In his new declaration, Novak claimed that, "barring any instructions

or other factors to the contrary," "one of ordinary skill in the mechanical arts in general, and stapler design in particular," would measure the distance any mechanical component travels by using the "straight-line distance traveled by a point on the component." (Novak Decl. ¶ 7.) He explained that he "see[s] no reason why one of ordinary skill in the art of stapler design would deviate from" the point-to-point method "when determining the distance the pressing area moves as the handle moves from the rest position to the pre-release position (as recited in claim 24), or when determining a handle pressing distance defined by the distance between the pressing area at the handle rest position and the pressing area at the handle pre-release position (as recited in claim 27)." (*Id.* ¶ 8.) He further contended that the specification supports this conclusion because, in the invention covered by the '709 patent, "[i]t is desirable to store sufficient energy in the power spring so that the stapler can drive a staple through multiple sheets of paper," and the point-to-point measurement encompasses the "total displacement of the handle," whereas the vertical measurement "does not reflect the total amount of energy stored in the power spring as a result of the displacement of the handle." (*Id.* ¶¶ 9–11.) Finally, he noted that both he and Staples' expert Feeley measured the travel of the striker with the point-to-point method, which he claims supports his position that the same measurement method should be used to measure the handle travel. (*Id.* ¶ 12.)

Yet, Novak cited no actual evidence to support his opinions other than his own statements, which alone warrant little weight in the claim construction context. *See Sinorgchem,* 511 F.3d at 1137 n. 3. Indeed, even his interpretation of the specification indicated that the point-to-point measurement method would merely "best" reflect the desirable characteristic of storing energy in the power spring, not that this method was *required,* and the value of his own subjective view of the specification is minimal, given that he provided no evidence that a person skilled in the art would similarly view the specification as *requiring* the point-to-point method. *See Symantec,* 522 F.3d at 1290–91.

Moreover, Novak's opinions are subject to reasonable dispute, undermining the value of Novak's testimony as extrinsic evidence that the point-to-point measurement method is required by the claims and specification. In addition to objecting to Novak's new testimony, Staples offered rebuttal opinions from its expert Feeley that raise serious questions about the persuasive value of Novak's views.[11] For example, Feeley explained that Novak's comparison to the method of measuring the *striker* travel was irrelevant to selecting the proper method of measuring the *handle* travel because the striker moves within a linear channel, which produces an identical travel distance whether the point-to-point or vertical measurement method is used. (Feeley Decl. ¶¶ 7–10.) Feeley also disagreed with Novak's opinion that a person of skill in the art would view the claim language and specification as requiring the point-to-point method of measurement because the method of measurement would be dictated largely by the measuring equipment available and readily available

---

11. Accentra objected to Feeley's declaration principally on the grounds that the declaration was belatedly submitted after the deadline to file supplemental briefing and considering the declaration now would provide Staples with an unfair advantage. (Docket No. 526.) Frankly, the objections are remarkable: Staples submitted Feeley's declaration to counter *Accentra's* improper new declaration from Novak, which itself carried a substantial risk of unfair surprise to Staples. Accentra's objections are OVERRULED and its request to file yet another expert declaration is DENIED.

equipment (such as the computer-assisted drawing (or "CAD") program) could measure in any of the ways at issue here. (*Id.* ¶ 12.) Moreover, Feeley believed that Novak's interpretation of the portion of the specification focused on the stored energy in the power spring was suspect because the stored energy is dictated by the design of the power spring itself, not the handle travel distance. (*Id.* ¶ 14.) Finally, Feeley disagreed with Novak's opinion that the point-to-point measurement method was required in light of the "interrelationship between the handle displacement and energy storage" because the concept of the handle moving independently of the striker is not new with the '709 patent. (*Id.* ¶ 15.) Thus, there is no intrinsic evidence and little extrinsic evidence to indicate the method to use to measure the handle travel.

Because no intrinsic or extrinsic evidence illuminates the outcome-determinative issue of which method of measurement should be used to measure the handle travel distance in order to locate the pressing area, the Court finds this case to be indistinguishable from *Honeywell International, Inc. v. International Trade Commission*, 341 F.3d 1332 (Fed.Cir.2003). In that case, the patent-in-suit covered a process for treating a particular type of yarn; the parties disputed the method by which to prepare yarn samples to measure the "melting point elevation" ("MPE"), a claimed feature of the invention that required the yarn to fall within a specified MPE range at some point during the process. *Id.* at 1334–35. There were four possible methods to prepare samples in order to test the melting point, and each method could cause the MPE to vary greatly; as a result, some of the test-preparation methods would have given rise to infringement, while others would not have. *Id.* at 1336.

The court invalidated the patent as indefinite, finding that "neither the claims, the written description, nor the prosecution history reference any of the four sample preparation methods that can be used to measure the MPE." *Id.* at 1339. The court identified three possible claim constructions: the "any one method" construction, which would have required that the MPE fall within the claimed values using any one test-preparation method; the "all methods" construction, which would have required that the MPE fall within the claimed values using all test-preparation methods; and the "ball method" construction, which would have required that the MPE fall within the claimed values using the "ball method" of test preparation, regardless of the results using the other methods. *Id.* The court found all the methods problematic: the "ball method" construction would have improperly imported limitations outside the bounds of the patent; the "any one method" construction would have produced some results that infringed and some that did not, so competitors would not have known whether they were practicing the invention; and the "all methods" construction would have rendered the invention inoperable. *Id.* at 1341–42. The court suggested that the "any one method" construction might have been permissible if the different methods produced "essentially identical results," but they did not. *Id.* at 1341.

As in *Honeywell*, there is nothing in the intrinsic and extrinsic evidence related to the '709 patent to indicate which of several possible measurement methods should be used. Allowing for any method of measurement suffers from the same problem identified in *Honeywell*: the method used (point-to-point or vertical) can dictate whether a competitor's stapler is practicing the invention with a pressing area that is "near" the front end of the handle and

that moves the required handle travel distance. Similarly, Accentra's newly proposed construction limited to the point-to-point method would improperly import a limitation not provided by the patent, just as the "ball only method" construction would have improperly imported a limitation into the patent in *Honeywell.* Just as the court in *Honeywell* concluded, the Court concludes that the '709 patent must be invalidated as indefinite.[12]

Just before oral argument in this case, Accentra cited a recent Federal Circuit opinion in which the Federal Circuit distinguished *Honeywell* and found the claims at issue to be definite. *See Wellman, Inc. v. Eastman Chem. Co.,* 642 F.3d 1355, 1368 (Fed.Cir.), *reh'g and reh'g en banc denied* (Aug. 11, 2011), *petition for cert. filed* (Nov. 9, 2011).[13] In *Wellman,* the patents-in-suit covered resins for use in plastic beverage containers, and one limitation required that the resin "has a heating crystallization exotherm peak temperature ($T_{ch}$) of more than about 140° C. at a heating rate of 10° C. per minute as measured by differential scanning calorimetry ['DSC']." *Id.* at 1358. The district court found the claim indefinite for its failure to disclose sample conditions and testing parameters essential for obtaining consistent DSC measurements, particularly with regard to measurement of moisture content and thermal history. *Id.* at 1359.

The Federal Circuit reversed, finding the claims were definite. *Id.* at 1366. With regard to moisture content, while there was no intrinsic evidence to indicate how to control the specific moisture conditions of the covered resin, there was published standard industry guidance on conditioning plastics for DSC and the patentee's expert explained that a person skilled in the art would have interpreted the claims at issue "in view of the internationally recognized" guidance. *Id.* at 1367–68. In light of this evidence, "nothing suggests that a person of skill in the art would fail to account for moisture or otherwise deviate from the standard conditions set forth in" the guidance. *Id.* at 1368.

Based on this factual record, the court distinguished *Honeywell:*

> In *Honeywell,* a person of skill in the art had to choose among four different sample preparation methods, with each method influencing whether the accused products fell within the scope of the asserted claims. This court concluded that the claims were insolubly ambiguous, and hence indefinite, because no intrinsic or extrinsic guidance indicated parameters sufficiently covered the range of conditions in each of the 69 accused commercial processes." *Id.* at 1377. Here and in *Honeywell,* by contrast, the patents did not simply allow for different possible methods to reach the same result. Instead, the patents contained claims that may or may not be infringed depending on the method chosen by the accused infringer. In that respect, the issue here is one of indefiniteness as in *Honeywell,* not infringement as addressed in *Union Carbide.*

12. Accentra cites *Union Carbide Chemicals & Plastics Tech. Corp. v. Shell Oil Co.,* 425 F.3d 1366, 1376–77 (Fed.Cir.2005), *overruled on other grounds by Cardiac Pacemakers, Inc. v. St. Jude Med., Inc.,* 576 F.3d 1348 (Fed.Cir. 2009) (en banc in relevant part), to argue that the testing method is a question of fact for the jury. *Union Carbide* is distinguishable on its facts, however, because it addressed whether a patent called for testing all 69 accused commercial processes or whether it allowed for representative testing conducted by the accused infringer's expert. *Id.* The court held that the sufficiency of the representative testing was a fact question for the jury "[b]ecause the claim does not require an exact match to the accused processes," and "Union Carbide had only an obligation to show that its test

13. Accentra does not explain why this April 29, 2011 decision was not brought to the Court's attention any earlier than May 10, 2011. (Docket No. 528.)

a single preferred method of sample preparation. Notably, the patentee's preferred construction in that case favored an unpublished method documented only in the patentee's proprietary files.

This case is very different. While the claims do not recite specific moisture conditions, the well-known practice in this field as illustrated by the [published guidance] made this a routine concern to a person of ordinary skill in the art. This court has repeatedly stated that a patent application need not include in the specification that which is already known to and available to a person of ordinary skill in the art. Because a person of ordinary skill in the art would have followed published industry standards, the asserted claims of the Wellman patents are not indefinite for failing to specify moisture conditions.

*Id.* (internal citations omitted). The court further found that the industry guidance would have indicated to a person skilled in the art how to test the resins to account for thermal history. *Id.*

*Honeywell,* and not *Wellman,* remains the controlling case here because Accentra has offered nothing close to the standard industry guidance in *Wellman* that a person skilled in the art would have used to interpret the claims at issue. The only extrinsic evidence to even suggest that a person might use the point-to-point method of measuring handle travel distance over other methods was the conclusory opinion of Accentra's expert, which was procedurally improper, uncorroborated, and subject to strenuous dispute. In the end, the instant case is no different from *Honeywell,* which, as recognized by *Wellman,* found the claims indefinite because

multiple outcome-determinative sample preparation methods could have been used and there was no intrinsic or extrinsic evidence to indicate which one was proper.

Therefore, the Court GRANTS Staples' motion for judgment as a matter of law that the '709 patent is invalid and the jury's verdict of infringement and damages must be set aside as to that patent.[14]

## C. Sufficiency of Evidence of Infringement

Staples also moves for judgment as a matter of law on the issue of infringement of all three of the patents-in-suit. Because the Court has found the '709 patent invalid as indefinite, Staples' challenge to the jury's infringement finding for that patent is moot and the Court addresses only Staples' arguments as to the other two patents. The Court concludes that substantial evidence supported the jury's verdict of infringement of those patents.

### 1. *'768 Patent*

■ Staples challenges the sufficiency of the evidence of infringement of the '768 patent, which requires that "the base sidewalls surround the track pull in the closed stapler position." (Cuomo Decl., Ex. 13 ('768 Patent), col. 12, ll. 15–16.) At claim construction, the Court construed the term "surround" to mean "to enclose or confine so as to bar escape." (Docket No. 87 at 21.) Based on a dispute between the parties at summary judgment over whether the term "sidewalls" could include other features, the Court construed the term "sidewalls" to mean "vertical walls that are extending from the base, which can include additional structures or features." (Docket No. 219 at 14–15.)[15]

---

14. The Court need not address Staples' alternative argument that the term "near" in the '709 patent was insolubly ambiguous.

15. Staples continues to vigorously object to the Court's claim construction that allows for additional features of the sidewalls, but the Court will not revisit that issue.

Staples raises several challenges to the sufficiency of the evidence that supported the jury's verdict of infringement, none of which is availing. First, Staples argues that a latch holds the track pull in place in the accused staplers, so the sidewalls of those staplers do not "surround" the track pull so as "to enclose or confine so as to bar escape." However, the evidence at trial amply demonstrated that the sidewalls, in fact, bar the track pull from escaping, even if a latch also exists. For example, Novak testified that, consistent with the Court's construction, the projections attached to the sidewalls of the accused staplers "block or surround or prevent the track pull from being withdrawn" and "[t]he track pull can't move backwards or up and down because contact is made between [the projections] and between the track pull, and the feature is structured that it's attached and extends from the sidewall." (Trial Tr. at 70–71 (Day 2 Morning).) Even Staples' expert testified that the projections attached to the sidewalls existed "to create a restrictive space to prevent the stapler track pull from inadvertently being operated, you know, accidentally operated." (Trial Tr. at 97 (Day 5 Afternoon).)

Second, Staples argues that the connecting "bridge" structure in the accused staplers designed to confine the track pull is not itself a "sidewall." At its essence, this argument is little more than an objection to the Court's construction of the term "sidewalls," which allowed for additional structures or features. As the claim was construed, however, the jury's verdict of infringement was supported by substantial evidence. For example, Novak testified that each accused stapler model has features attached to the sidewalls (i.e., "little steps") that bar the track pull from escaping. (Trial Tr. at 71 (Day 2 Morning).) In the CX–1, DX–1, and High Capacity models, those structures are molded into a single piece of plastic that spans the entire bottom of the stapler, which Staples calls a "bridge." Staples' expert testified that this structure exists in part to "keep the sidewalls from splaying outwardly or from towing in during the manufacturing process." (Trial Tr. at 97 (Day 5 Afternoon).)

Novak testified that the "little steps" connected to the sidewalls fell within the '798 patent's claim limitations despite the presence of the additional connecting "bridge" because, as a "comprising" claim, an accused device could have additional features and still be infringing. (Trial Tr. at 71 (Day 2 Morning).) In his words, the continuous bar was "an extra feature that's beyond the sidewalls, beyond the structure that's part of the sidewall, that prevents [or] bars from escape of the track and track pull. We have this additional structure, but it doesn't affect my opinion." (*Id.*) On cross-examination, Novak admitted that he was not sure whether the entire "bridge" itself was a "sidewall," but indicated that it was adjoining the features extending from the sidewall that he considered part of the sidewalls:

Q. Now, you testified in your direct examination that there was a bar on the underside of the stapler, the CX–1; is that right?

A. I said there was a bar adjoining the features on the sidewall extending ·from the sidewall, yes.

Q. And that bar is substantially parallel to the base.

A. Yes.

. . .

Q. So when you found infringement, you'd agree that that bar itself is not a sidewall; right?

A. Well, it's not clear to me where the feature on the sidewall begins and the bar begins or whether it's the same. It's—it's—it can't be a part of the left sidewall and part of the

right sidewall at the same time; so as far as language and definitions are concerned, I don't know, but what I do know is that coming off the sidewall, the structures that are attached to the sidewall are part of the sidewall.

Q. So let me just see if I understand what you're saying. You're cutting the structure, you're considering this portion here (indicating), the portion underneath the sidewall, you're saying that is a feature, an additional feature of the sidewall?

A. It's part of the sidewall.

Q. And you're saying it's separate from the bar structure as a whole?

A. I think I said I don't know.

Q. You don't know whether they're two structures or one structure?

A. Well, it's all molded. It looks like it's all molded as one piece.

Q. But all of it is on the underside of the track pull; right?

A. It looks like it, yes.

(Trial Tr. at 49–51 (Day 2 Afternoon).)

Staples argues that Novak was attempting to improperly modify a "unitary structure" of the "bridge" at the bottom of the accused staplers to find infringement, which is not permitted. *See, e.g., Telemac Cellular Corp. v. Topp Telecom, Inc.*, 247 F.3d 1316, 1330 (Fed.Cir.2001) ("[T]hat a device is capable of being modified to operate in an infringing manner is not sufficient, by itself, to support a finding of infringement."). But that is not what Novak did. He opined that the addition of the complete bridging structure did not alter his opinion that the portions of the structure attached to the sidewalls met the claim limitations.

The jury was entitled to credit Novak's opinion that the complete "bridge" was merely an addition that did not defeat the "comprising" claim in the '768 patent. *See*

*Genentech, Inc. v. Chiron Corp.*, 112 F.3d 495, 501 (Fed.Cir.1997) (" 'Comprising' is a term of art used in claim language which means that the named elements are essential, but other elements may be added and still form a construct within the scope of the claim."). Even Staples' expert Feeley's opinion of no infringement supports Novak's conclusion that the complete "bridge" was merely an additional feature that did not affect infringement. He explained that the complete bridge on the CX–1, DX–1, and High Capacity models served a purpose of preventing the sidewalls from splaying, whereas the EX–5 model did not have a complete "bridge" because it was a metal stapler and had "less of a need for controlling the towing out and towing in of the sidewalls during manufacturing, so it doesn't have a bridge running from one side to the other. *So it only contains that portion which was necessary—two little shelves to prevent the latch from being unintentionally actuated.*" (Trial Tr. at 98 (Day 5 Afternoon) (emphasis added).) Thus, the complete bridge was unnecessary to "surround" the track pull as required by the '768 patent and the jury could have credited Novak's testimony that the bridge was simply an additional structure that did not affect infringement.

Finally, Staples contends that the projections in the EX–5 model (and the end portions of the "bridge" on the CX–1, DX–1, and High Capacity models) are not "sidewalls" or even "additional structures" as required by the '768 patent, relying entirely on its own expert's opinion on the issue. Of course, the Court must disregard Staples' evidence in ruling on a motion for judgment as a matter of law, since the jury was entitled to (and did) reject it. *See Wallace*, 479 F.3d at 624. As discussed, Novak testified that the structures on the accused staplers were sidewalls that fell within the claim language and there-

fore infringed the '768 patent. There was substantial evidence to support the jury's verdict of infringement and Staples' motion with regard to the '768 patent is DENIED.

### 2. *'692 Patent*

■ Claims 6 and 7 of the '692 patent cover a safety mechanism in a spring-powered stapler. Independent claim 6 discloses in relevant part:

A safety mechanism for a self-powered tool that ejects and drives fasteners into a working surface, comprising: ... a locking means disposed at the front end of the body and having a first portion that is biased out from the bottom of the body, the locking means having a second portion that is biased to advance into at least one of the power spring, striker, and handle to prevent at least one of the power spring, striker, and handle respectively from moving to complete a cycle to eject the fasteners from the guide track, wherein the first portion of the locking means presses the cover plate adjacent to the depression while in the pressed position of the base to retract the second portion; and

a biasing means biasing the locking means.

(Cuomo Decl., Ex. 12, col. 13, ll. 34–45.)

Independent claim 7 discloses in relevant part:

A safety mechanism for a self-powered tool that ejects and drives fasteners into a working surface, comprising: ... a locking means disposed at the front end of the body and having a first portion that is biased out of the body and includes a second portion that is biased to engage at least one of the power spring, striker, and handle to block at least one of the power spring, striker, and handle respectively from moving to complete a cycle to eject fasteners from the guide track.

(*Id.*, col. 14, ll. 12–18.)

At the claim construction stage, the Court found the term "locking means" to be a means-plus-function element pursuant to 35 U.S.C. § 112, ¶ 6 and construed the function as "locking or interfering with at least one of the power spring, striker, and handle to prevent or block at least one of the power spring, striker, and handle respectively from moving to complete a cycle." (Docket No. 87 at 16.) Based on the parties' general agreement, the Court construed the structure as:

a safety hook (structure 70 in Figures 1, 2, 4, and 5–9), a sensing end of a button bar (structure 306 in Figures 1, 2, 4 and 5–9), a bottom pivoting lock bar (180a in Figures 11–13); a pivoting lock bar (180b in Figures 14–18); a lock bar that undergoes a cam action (structure 280 in Figures 19–20).

(*Id.* at 17.) At trial, Accentra presented evidence and argued that the safety mechanisms in the accused staplers were equivalent under 35 U.S.C. § 112, ¶ 6. In finding the '692 patent infringed by each of the accused staplers, the jury must have agreed. Staples now moves to set aside that finding.

■ In order for an accused product to infringe pursuant to § 112, ¶ 6, it must be "equivalent," that is, it must "perform the identical function" as the patented invention and must "be otherwise insubstantially different with respect to structure." *Kemco Sales, Inc. v. Control Papers Co.*, 208 F.3d 1352, 1364 (Fed.Cir.2000). Structures are equivalent under § 112, ¶ 6, then, "if they perform the identical function, in substantially the same way, with substantially the same result." *Id.*

Staples contends that Accentra's expert Gary Novak "never expressly compared the safety in the accused products to that

described in the patent and never explained how or why a person of ordinary skill in the art would consider them to be equivalent." (Mot. 12.) Staples' view of the record is both unduly narrow and factually incorrect. Novak opined that the structures were, in fact, equivalent and explained how that was so. The jury was free to accept his testimony, which was substantial evidence to support the jury's finding of infringement.

At trial, Novak testified that the structure of the safety mechanisms in the accused staplers (which did not materially vary among the different models) was substantially equivalent to the structures disclosed in Figures 1–10 and Figures 19 and 20 in the '692 patent. (Trial Tr. at 5, 14 (Day 2 Afternoon).) He drew these conclusions based upon his detailed explanation of the way in which the structure of the safeties in the accused staplers performed the function of "locking or interfering with at least one of the power spring, striker, and handle to prevent or block at least one of the power spring, striker, and handle respectively from moving to complete a cycle," which he opined was substantially similar to the way in which the structures disclosed in the '692 patent performed the identical function. For example, Novak presented an animated demonstrative as to the way the cam-driven lock bar structure disclosed in Figures 19 and 20 moved horizontally to perform the required function (*Id.* at 5–8 (Day 2 Afternoon)) and then used a similar animated demonstrative of the EX–5 stapler model to show how the camming structure of the accused staplers also moved in a substantially horizontal way, which was substantially the same as the structure disclosed in Figures 19 and 20 (*Id.* at 8–11). Novak also testified that the two-piece rigid structure in Figures 1–10 moves horizontally to perform the required function and opined that the structures of the safeties in the accused devices performed the same func-

tion in substantially the same way. (*Id.* at 12–14.) Although Novak did not explicitly compare the accused safeties to the structures in Figures 1–10, the jury had already been presented with his testimony on the structure of the accused safeties, so the jury had the evidence upon which to draw the conclusion that the structures were equivalent. The jury was entitled to rely on Novak's explanation of how the safeties in the '692 patent and the accused devices worked and rely upon his ultimate opinion of equivalence to conclude that the safeties in the accused devices were, in fact, equivalent.

For this reason, the two published cases cited by Staples are distinguishable because in both, the patentee lacked evidence on equivalence of the structures at issue. *See Toro Co. v. Deere & Co.*, 355 F.3d 1313, 1324 (Fed.Cir.2004) (affirming summary judgment because patentee "fail[ed] to articulate the technical similarities" between the structures alleged to be equivalent, "or why the differences between the two systems are insubstantial, particularly with respect to the *way* the claimed function is performed." (emphasis in orig.)); *Alpex Computer Corp. v. Nintendo Co.*, 102 F.3d 1214, 1222 (Fed.Cir.1996) (rejecting equivalence because patentee's expert opined only on the similarity of function, not structure). Here, by contrast, Novak explained how the structures were similar by, for example, demonstrating that the structure in Figures 19 and 20 called for a cam action and horizontal movement, which was present in the EX–5 safety mechanism (and other accused stapler models). The evidence was sufficient to sustain the jury's finding of equivalence.

Staples argues that Novak's testimony was nevertheless insufficient because its expert Feeley testified that the safety mechanisms in the accused staplers were not equivalent. (Trial Tr. at 105–17 (Day

5 Afternoon).) Feeley opined that the accused staplers had safeties with two pieces that slide in different directions, which are substantially different from the structures in the patent that disclose essentially one-piece structures that pivot. (*Id.*) Once again, though, the jury was entitled to reject Feeley's testimony, and the Court must disregard it in ruling on Staples' motion.

In any case, while Novak agreed on cross-examination that there were differences between pivoting and sliding generally and that a one-piece mechanism provides limitations that a two-piece mechanism does not (Trial Tr. at 33–34 (Day 4 Morning)), he testified that the key movement of the safety disclosed in Figures 19 and 20 was horizontal: "When the cam or lock bar is pushed up, the blocking surface moves horizontally." (Trial Tr. at 7 (Day 2 Afternoon).) This interpretation was confirmed by the '692 patent specification, which, rather than being limited to pivoting action, discloses that in Figures 19 and 20, the "[l]ock bar 280 is *slidably* and pivotably fitted to body 210 and undergoes a cam action," and "[i]n its cam action, lock bar 280 *slides,* jogs, and/or pivots along a path defined by guides 218 formed inside body 210." (Cuomo Decl., Ex. 12, col. 11, ll. 21–28 (emphasis added).) Novak also testified that the key movement for the structure disclosed in Figures 1–10 was horizontal, explaining that the structure converts vertical motion to horizontal motion. (Trial Tr. at 12–13 (Day 2 Afternoon); Trial Tr. at 33 (Day 4 Morning).) As for the two-piece mechanism, while Novak testified that it might have been different from a one-piece mechanism, he did not specifically testify that any difference was *substantial* (Trial Tr. at 33–34

(Day 4 Morning)), and, in any case, he testified that the structures in Figures 1–10 teach that a two-piece structure could be used and still be equivalent (Trial Tr. at 10, 12 (Day 5 Afternoon)).

■ Under § 112, ¶ 6, the issue of whether an accused structure is equivalent to the structure in a patent "is a question of fact." *Utah Med. Prods., Inc. v. Graphic Controls Corp.,* 350 F.3d 1376, 1383 (Fed.Cir.2003). The jury was free to reject Feeley's testimony and credit Novak's testimony, which provided substantial evidence for the jury to find that the safeties in the accused staplers infringed the '692 patent pursuant to § 112, ¶ 6. Staples' motion with respect to the '692 patent is DENIED.

### D. Sufficiency of Evidence of Reasonable Royalty

Staples moves to reduce the jury's total reasonable royalty award of $2.2 million for several reasons. First, Staples argues that only a reasonable royalty of $229,000 is supported by the evidence—which was the amount testified to by Staples' damages expert Christopher Barry—because Accentra's expert Glen Newman's testimony was unreliable under *Daubert*[16] and cannot be properly considered in determining whether sufficient evidence supported the jury's verdict. Second, Staples contends that, even if Newman's testimony was not deficient, he testified to a reasonable royalty of *at most* $1.7 million, so the additional $505,192 awarded by the jury was not supported by the evidence. Finally, Staples argues that the jury's royalty award of $321,738 for infringement by the High Capacity stapler must be reduced because Newman applied the same royalty rate of 10% to that stapler as he applied to

---

16. *Daubert v. Merrell Dow Pharms., Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).

the other accused staplers, even though the High Capacity model was accused of infringing only the '768 and '692 patents. Accentra briefly responds to these points, and primarily requests that, if the Court finds any reason to reduce or set aside the jury's verdict, it be granted a new trial on damages.

The Court finds that Staples waived most of its objections to Newman's testimony and the objections not waived did not render his testimony inadmissible and insufficient to support a reasonable royalty rate of 10%. However, the jury's damages award exceeded even that rate, and it must be reduced to 10%, which is the highest reasonable royalty rate supported by the evidence at trial. Moreover, the jury's apportionment of damages was not supported by substantial evidence because Newman failed to apportion damages among the patents, which was necessary because the Court has found the '709 patent to be invalid and the High Capacity stapler was accused of infringing only the '769 and '692 patents. However, because Staples' damages expert apportioned the royalty rate among patents, albeit using a much lower rate than 10%, the Court can apportion the 10% royalty rate per patent, per product, and enter a damage award accordingly. Finally, because the reduction of the damages award is based on a legal defect in the evidence, not on the Court's reweighing of the evidence, no new trial is necessary.

### 1. Admissibility of Newman's Testimony

Staples argues that the Court must ignore Newman's testimony in ruling on its Rule 50(b) motion because it is inadmissible under *Daubert. See Weisgram v.*

*Marley Co.*, 528 U.S. 440, 453, 120 S.Ct. 1011, 145 L.Ed.2d 958 (2000) (noting that inadmissible expert testimony cannot support a verdict because inadmissible evidence "contributes nothing to a 'legally sufficient evidentiary basis'" under Rule 50(a)). Staples identifies several objections to support this contention: (1) Newman did not provide sufficient testimony on the *Georgia–Pacific*[17] factors to support his royalty calculation; (2) he failed to tie the reasonable royalty to the patented features of the accused staplers; (3) he relied on a so-called "25% Rule of Thumb," which was recently disapproved by the Federal Circuit [18]; (4) he testified to matters to which he had no personal knowledge; and (5) he applied the same royalty rate to the High Capacity stapler as he applied to the CX–1, DX–1, and EX–5 models, even though the High Capacity was accused of infringing only two of the three patents-in-suit. The Court concludes that Staples waived objections (1), (3), and (4) by failing to raise them before now and concludes that objections (2) and (5) do not render Newman's testimony inadmissible, although they affect whether substantial evidence supported the jury's damages award.

### a. Objections (1), (3), and (4) Are Waived

In order to advance a post-verdict judgment as a matter of law under Rule 50(b), a party must comply with Rule 50(a), which strictly requires that the motion first be made after the close of all evidence, but before the verdict. *Zhang v. Am. Gem Seafoods, Inc.*, 339 F.3d 1020, 1029 (9th Cir.2003). The failure to timely raise an issue constitutes "a complete

---

**17.** *Georgia–Pacific Corp. v. U.S. Plywood Corp.*, 318 F.Supp. 1116 (S.D.N.Y.1970), *modified on appeal sub nom., Georgia–Pacific Corp. v. U.S. Plywood–Champion Papers, Inc.*, 446 F.2d 295 (2d Cir.1971).

**18.** *See Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1311–18 (Fed.Cir.2011).

waiver, precluding [the] consideration of the merits of the issue." *Id.* at 1028–29. Specifically with regard to expert testimony, "the appropriate time to raise *Daubert* challenges is at trial" and failing to do so results in waiver, even when the argument is "couche[d] . . . in terms of insufficiency of the evidence." *Marbled Murrelet v. Babbitt,* 83 F.3d 1060, 1067 (9th Cir.1996). This failure deprives the opposing party of the chance to remedy the defect or shore up the showing with other evidence. *See Bartleson v. United States,* 96 F.3d 1270, 1277–78 (9th Cir.1996) (finding objections to expert's testimony after trial waived for failure to object to evidence before it was admitted or before judgment was entered). And the ability to challenge certain evidence is not preserved merely by lodging any objection before or during trial; the specific grounds advanced for exclusion must have been raised. *Price v. Kramer,* 200 F.3d 1237, 1252 n. 16 (9th Cir.2000) ("The fact that the defendants made the other evidentiary objection at trial does not preserve the objection they failed to make.").

Nothing in the record indicates that Staples raised grounds (1), (3), and (4) at any point before the jury returned its verdict. Before trial, Staples filed a motion *in limine* to exclude Newman's testimony, but that motion was limited to two alleged flaws in Newman's opinion of reasonable royalties: (1) Newman failed to tie his royalty calculation to the specific patented features of the accused staplers; and (2) Newman's testimony as to the High Capacity model was flawed because he applied the same royalty rate to it, even though that model was accused of infringing only the '768 and '692 patents. (Docket Nos. 239, 309.) After the close of Accentra's case, and again at the close of all testimony, Staples moved for judgment as a matter of law on damages, referring back to those two grounds raised in the motion *in limine.* (Trial Tr. at 129–30 (Day 5 Afternoon); Trial Tr. at 24 (Day 6 Morning).) At no point before the verdict did Staples challenge Newman's testimony based on the "25% Rule of Thumb," his lack of personal knowledge, or the sufficiency of Newman's testimony on the *Georgia–Pacific* factors.[19] As a result, those objections are waived.[20]

b. *Objection (2): Tying Royalty to Patented Features*

Expert testimony on a reasonable royalty rate "must 'carefully tie proof of damages to the claimed invention's footprint in the market place.'" *Uniloc,* 632 F.3d at 1317. On a post-verdict motion for judgment as a matter of law, the Court "must scrutinize the evidence carefully to ensure that the 'substantial evidence' standard is satisfied, while keeping in mind that a reasonable royalty analysis 'necessarily involves an element of approximation and uncertainty.'" *Lucent Techs., Inc. v. Gateway, Inc.,* 580 F.3d 1301, 1336 (Fed. Cir.2009).

---

**19.** Indeed, Staples did not even cross-examine Newman on these deficiencies when it had the opportunity to do so. (Trial Tr. at 63–92 (Day 5 Morning).)

**20.** With regard to the "25% Rule of Thumb," although not argued by Staples, it is no defense to say that the Federal Circuit only decided *Uniloc* after the jury's verdict in this case, so the issue could not have been raised before the verdict. Even before trial, the

"25% Rule of Thumb" was far from a generally accepted method of calculating a reasonable royalty, which the *Uniloc* court itself explained in detail. *See* 632 F.3d at 1313–15. Indeed, the issue in that case came to the Federal Circuit on the accused infringer's denied motion *in limine* to exclude expert testimony based on the "25% Rule of Thumb," *id.* at 1312, so there is no reason why Staples could not have challenged Newman's testimony before or during trial in the same way.

Staples argues that Newman's testimony must be excluded because he did not attempt to tie demand to any individual patent, but analyzed the patents collectively to determine the reasonable royalty. (*See, e.g.*, Trial Tr. at 78 (Day 5 Morning).) The Court already rejected this argument in Staples' motion *in limine* and there is nothing in the trial record to change that conclusion. There was nothing inherently unreliable about Newman's assumption that all three patents were infringed in determining the reasonable royalty rate that would have arisen from hypothetical negotiations between the parties; he testified that damages experts routinely assume infringement liability in order to assess damages.[21] (Trial Tr. at 63 (Day 5 Morning).) As Newman suggested, in reconstructing the hypothetical negotiation, Accentra would have come to the negotiating table with the patents at issue and would have negotiated a reasonable royalty for all of those embodied in the accused products. (Trial Tr. at 57 (Day 5 Morning).) In fact, Newman testified that Worktools took a similar approach to its licensing negotiations—that is, it would negotiate royalties based on each stapler sold, regardless of the number of patents involved. (Trial Tr. at 85 (Day 5 Morning).)

Similarly, Newman testified (albeit summarily) to the link between the patented features collectively and demand for the accused staplers, which is only one of many factors in the *Georgia Pacific* analysis. (Trial Tr. at 49–50 (Day 5 Morning).) Staples contends that it has found nothing in the case law to endorse this approach, but it also has pointed to nothing in the case law to foreclose it when analyzing the patents' collective "footprint in the marketplace," especially in a reasonable royalty

analysis, which attempts to reconstruct the hypothetical negotiations of the parties. *See Uniloc*, 632 F.3d at 1317. Absent specific guidance that this approach is improper when the circumstances of the case indicate that the parties could have approached negotiations in this way, the Court will not exclude Newman's testimony on this ground.

### c. *Objection (5): Royalty for High Capacity Stapler*

Staples contends that, at the very least, Newman's testimony must be excluded as to the High Capacity stapler because it was accused of infringing only two of the three patents-in-suit, yet he applied the same 10% reasonable royalty rate to that stapler as he applied to the CX–1, DX–1, and EX–5 models, which were accused of infringing all three patents. Although this argument undermines the legal sufficiency of the evidence supporting damages for the High Capacity stapler (discussed below), it is not a ground to exclude Newman's testimony entirely. As noted above, Newman testified that Worktools negotiated licenses based on each stapler sold, regardless of the number of patents involved. (Trial Tr. at 85 (Day 5 Morning).) Worktools' Chief Executive Officer Brad Goldstein confirmed that Worktools received the same royalty for Accentra's Paperpro products, whether the product was covered by one patent or ten patents. (Trial Tr. at 51 (Day 4 Morning).) While Staples urges that the use of the same royalty rate for the High Capacity stapler suggests that the '709 patent (not alleged to be infringed by that model) is valueless, the equally valid inference is that the patent's value is difficult to quantify, so Worktools and Accentra would customarily set a flat royalty rate regardless of the number

---

21. The fact that the Court has invalidated the '709 patent impacts the legal sufficiency of Newman's testimony (discussed *infra*), but his testimony need not be entirely excluded for this reason.

of patents involved. Nothing indicates that Newman could not take the same approach in reconstructing the hypothetical negotiations. Newman's testimony is not excludable on this basis.

### 2. *Reduction of Total Award*

■ Staples contends that the $2.2 million award must be reduced because it was based on a royalty rate higher than even the highest reasonable royalty of 10%, which was the reasonable rate to which Newman testified. "A party challenging a jury's verdict on damages 'must show that the award is, in view of all the evidence, either so outrageously high or so outrageously low as to be unsupportable as an estimation of a reasonable royalty.'" *Powell v. Home Depot U.S.A., Inc.,* 663 F.3d 1221, 1238 (Fed.Cir.2011). While "the jury is not bound to accept a [reasonably royalty] rate proffered by one party's expert but rather may choose an intermediate royalty rate," *Fuji Photo Film Co. v. Jazz Photo Corp.,* 394 F.3d 1368, 1378 (Fed.Cir.2005), it must adopt a rate "within the range encompassed by the record as a whole," *Unisplay, S.A. v. Am. Elec. Sign Co.,* 69 F.3d 512, 519 (Fed.Cir.1995).

Here, the "range" of reasonable royalty rates supported by the record was 1.5% at the lower end, as Staples' expert Barry testified (Trial Tr. at 53–54 (Day 6 Morning)), and 10% at the higher end, as Accentra's expert Newman testified (Trial Tr. at 60–61 (Day 5 Morning)). The jury awarded $2.2 million in a reasonable royalty, based on $16.7 million in sales (*id.* at 59; Docket No. 472), which amounts to a reasonable royalty rate of over 13%. That rate was not supported by the evidence offered at trial.

The jury's verdict appears to be based upon a passing comment by Newman that Staples would make an extra $2.2 million in profit by infringing Accentra's patents:

> I did want I though[t] would have been a reasonable negotiation and looked at how much was being given up in terms of $3.04 per unit versus how much Staples was making on their existing unit and the fact that Staples would now go directly to China and make an extra $2.2 million and that some portion of that should go back in the form of a royalty, and Staples is still better off than had they bought them directly from Accentra.

(Trial Tr. at 79–80 (Day 5 Morning); *see also id.* at 82 (testifying that Staples would "look at the relationship as a whole, and if they see that they can make an extra $2.2 million, they'd be willing—and that's besides their normal profit that they make on these products. That's extra profit.").) However, Newman did not testify that the $2.2 million was based on a *reasonable* royalty rate of 13% reached during a hypothetical negotiation; indeed, he noted that only "some portion" of the $2.2 million should go to Accentra as a reasonable royalty, which was consistent with his view that the reasonable royalty rate was 10%, which would have resulted in damages at most of $1,678,613.[22]

Thus, the most the jury could have awarded in royalty damages was

---

**22.** The record here distinguishes this case from *Home Depot,* in which the court approved royalty damages based in part on the "'estimated cost savings from the use of the infringing product'" and "'the value of the benefit conferred to the infringer by use of the patented technology.'" 663 F.3d at 1240. In that case, the plaintiff's expert had provided a reasonable royalty range that encompassed the jury's verdict and had testified to the potential cost savings to the infringer by using the patentee's product. *Id.* Here, in contrast, while Newman testified that $2.2 million might be extra profit to Staples, he did not testify that the full $2.2 million would be within the range of a reasonable royalty. Thus, the $2.2 million awarded by the jury was not supported by the record.

$1,678,613, based on Newman's testimony that the reasonable royalty rate was 10%.

### 3. *Effect of Invalidity of the '709 Patent on Damages*

■ The Court must analyze the effect of invalidating the '709 patent on the jury's award of reasonable royalty damages, which is no easy task. It might seem like a straightforward exercise, given that the jury divided the total $2,205,192 verdict both by patent and by infringing model of stapler. (Docket No. 472.) While slightly more complicated by the fact that the Court had to reduce the total award to $1,678,613, the Court still needs only to determine the proportional allocation for each patent and each product and reduce it accordingly. Once that is done, subtracting the award for the '709 patent should yield an accurate damages award.

The problem with this approach, however, is that there must have been sufficient evidence to support the jury's apportionment in the first place, and there was not. The jury's aggregated reasonable royalty rate of 13% was apportioned as follows per patent and per product: 4.82% for each of the three patents in the CX–1, DX–1, and EX–5 models; and 4.33% for each of the '768 and '692 patents in the High Capacity model. There was no evidence presented at trial to support this allocation. First, as Staples argues and the Court discussed *supra*, Newman's testimony on the royalty rate assumed the three patents were infringed by the CX–1, DX–1, and EX–5 models, so he provided no allocation methodology. (Trial Tr. at 63–69 (Day 5 Morning).) Second, the High Capacity model was not accused of infringing the '709 patent, yet there was no evidence to support the jury's rate of 4.33% for the '768 and '692 patents embodied in that model, which was lower than the 4.82% rate for those same patents in the other models.

Staples argues that, in this circumstance, the jury's damages award must be thrown out entirely, and the proper starting point for any damages calculation in light of the invalidity of the '709 patent must be $229,000, based on Barry's testimony as to the reasonable royalty rate of 1.5%, which he apportioned per patent, per device. (Then that number would be further reduced to account for the invalidity of the '709 patent.) That approach cannot be correct because the Court cannot ignore Newman's testimony that 10% was a reasonable royalty rate overall. Barry testified that 1.5% was a reasonable royalty rate, far lower than Newman's 10% rate. (Trial Tr. at 69 (Day 6 Morning).) The jury must have at least credited Newman's testimony over Barry's, as it awarded damages that amounted to an actual royalty rate of 13%, above even Newman's rate. As explained above, Staples waived the challenge to Newman's royalty *rate* (as distinct from the amount of damages), so that part of Newman's testimony remains intact and the only remaining narrow issue is apportionment of the reasonable royalty per patent, per device.

Fortunately, the Court can rely on Barry's apportionment, even if not his reasonable royalty rate, since his apportionment was the only method offered in evidence. Barry testified that the reasonable royalty rate in this case should be 1.5%, which he allocated among the patents as follows: .6% for the '709 patent; .6% for the '768 patent; and .3% for the '692 patent. (Trial Tr. at 69 (Day 6 Morning).) Using that same allocation for Newman's 10% reasonable royalty rate, the allocation should be as follows: 4% for the '709 patent; 4% for the '768 patent; and 2% for the '692 patent. Eliminating the 4% royalty rate for the '709 patent, Accentra is left with a 4% reasonable royalty rate for the '768 patent and a 2% reasonable royalty rate for the '692 patent. The amount of damages supported by the evidence is thus based on those royalty rates, although the Court

leaves the calculation of the dollar amount to the parties to be included in a final judgment.[23]

###### 4. *New Trial on Damages*

■ Because the Court has to set aside the jury's damages calculation, Accentra asks that the Court grant a new trial on damages, while Staples requests that the Court simply reduce the damages to whatever is supported by the record (which, in their view, is $229,000, the amount proffered by Staples' expert Barry). Rule 50(b) permits the Court to order a new trial on an issue raised in a post-verdict motion for judgment as a matter of law, but the parties dispute whether a new trial is *mandated* in this case. Accentra argues that the Court must offer it the option of a new trial before reducing its damages; otherwise, Accentra's Seventh Amendment right to a jury trial would be violated. *See, e.g., Hetzel v. Prince William Cty.,* 523 U.S. 208, 211, 118 S.Ct. 1210, 140 L.Ed.2d 336 (1998) (per curiam) (holding that, when a court imposes a remittitur of a jury's damages award, the court must offer the plaintiff the option of a new trial). Staples argues that a new trial need not be offered when the evidence is found to be legally deficient on a Rule 50 motion; in that circumstance, the Court can simply reduce the damage award without violating the Seventh Amendment. *See, e.g., Cent. Office Tele., Inc. v. Am. Tele. & Tele. Co.,* 108 F.3d 981, 993 (9th Cir.1997) ("Rule 50 of the Federal Rules of Civil Procedure allows a court to set aside the verdict of the jury and enter judgment as a matter of law, and has been held to be constitutional-ly compatible with the Seventh Amendment."), *rev'd on other grounds* 524 U.S. 214, 118 S.Ct. 1956, 141 L.Ed.2d 222 (1998).[24]

The Court agrees with Staples that no new trial is mandated here because the issues are legal and do not require the Court to reweigh the evidence to determine whether the award must be reduced. *See, e.g., Tronzo v. Biomet, Inc.,* 236 F.3d 1342, 1350–52 (Fed.Cir.2001); *Johansen v. Combustion Eng'g, Inc.,* 170 F.3d 1320, 1330–31 (11th Cir.1999). In *Johansen,* for example, the court drew a distinction between cases like *Hetzel,* which involved a pure remittitur under Rule 59 as an exercise of the court's discretion, and cases in which a reduction is made under Rule 50 because there is a legal infirmity (in that case, because the damages award may have exceeded constitutional due process standards). 170 F.3d at 1331–32. Likewise, the court in *Tronzo* followed *Johansen* to conclude that the district court's reduction of the damages award based on the lack of legally sufficient evidence was not a remittitur because it "did not reweigh any evidence, nor did it exercise its discretion in computing the damages award. Instead, the court awarded the maximum damages possible given the lack of competent evidence in the record." 236 F.3d at 1351.

Here, as in *Johansen* and *Tronzo,* Staples' challenge to the damages award comes via Rule 50 and the Court has not reweighed any evidence to reach the damages figures herein. Instead, the Court

---

**23.** The Court's own calculation is as follows. The revenues per product are $2,995,581 for the CX–1, $4,680,247 for the DX–1, $5,362,541 for the EX–5, and $3,713,770 for the High Capacity. Based on those revenues, Accentra's royalty damages would be as follows: for the '768 patent, $119,823.24 (CX–1), $187,209 (DX–1), $214,501.64 (EX–5), $148,550.80 (High Capacity); and for the '692 patent, $59,911.62 (CX–1), $93,604.94 (DX–1), $107,205.82 (EX–5), $74,275.40 (High Capacity). That equals total royalty damages of $1,005,128.34, although the Court leaves to the parties the final calculation.

**24.** The Court applies Ninth Circuit law to the question of whether to grant a new trial. *Uniloc,* 632 F.3d at 1309.

has identified the maximum award supported by substantial evidence by ascertaining (1) maximum reasonable royalty legally supported by the record and (2) the only allocation of that royalty rate supported by the record in light of the invalidity of the '709 patent.[25]

From a practical perspective, no new trial is warranted because Accentra has not demonstrated that, if given a second chance to prove damages, it could offer new evidence to remedy the legal infirmities in its damages case. Accentra has pointed to no evidence it could have but did not present to the jury to support either the jury's 13% reasonable royalty rate or the jury's allocation of that rate per patent, per device, and the Court will not permit Accentra to conduct any further discovery to obtain that evidence at this stage. Accentra knew before trial that Staples objected to the absence of testimony from Newman on apportionment (Docket No. 239 (motion *in limine* to exclude Newman's testimony on that ground)), yet Newman still provided no testimony on that point. And, as Staples outlines, Accentra benefitted in various ways from that tactical decision not to present evidence of allocation. (Docket No. 534 at 7–8.) Reopening discovery now—after a jury trial—for Accentra to develop that evidence would manifestly prejudice Staples. The Court concludes that no new trial on damages is warranted in this circumstance.

### E. Sufficiency of Evidence of Willful Infringement

Staples moves for judgment as a matter of law that there was insufficient evidence to support the jury's verdict that it willfully infringed the patents-in-suit. The issue of willful infringement with regard to the '709 patent is moot based on the Court's ruling that the patent is invalid. The Court agrees with Staples that insufficient evidence was offered to demonstrate willful infringement of the '768 and '692 patents and sets aside the jury's willfulness finding with regard to those two patents.

#### 1. *Legal Standard*

To establish willful infringement, the patentee must first "show by clear and convincing evidence that the infringer acted despite an objectively high likelihood that its actions constituted infringement of a valid patent." *In re Seagate Tech., LLC,* 497 F.3d 1360, 1371 (Fed.Cir.2007) (en banc). "The state of mind of the accused infringer is not relevant to this objective inquiry." *Id.* "If the accused infringer's position is susceptible to a reasonable conclusion of no infringement, the first prong of *Seagate* cannot be met." *Uniloc,* 632 F.3d at 1310. An accused infringer can defeat the first prong of *Seagate* by adopting a reasonable claim construction that would result in no infringement, even if that construction is ultimately found to be incorrect. *See Cohesive Techs., Inc. v. Waters Corp.,* 543 F.3d 1351, 1374 (Fed. Cir.2008) ("Because 'rigid' was susceptible to a reasonable construction under which Waters's products did not infringe, there was not an objectively high likelihood that Waters's actions constituted infringement."). Because claim construction is a matter of law for the Court, the question of whether the accused infringer's interpretation of the claims was objectively un-

---

**25.** Accentra cites *Minks v. Polaris Indus., Inc.,* 546 F.3d 1364, 1370–75 (Fed.Cir.2008), but it is distinguishable. In that case, the court required that a new trial be offered because the district court necessarily had to weigh (and reject) evidence regarding the reasonable royalty factors in order to reduce the compensatory damages award. *Id.* at 1375 (distinguishing *Tronzo* and stating that "Minks has presented at least 'limited evidence' that the district court necessarily rejected in adopting a reasonable royalty rate of four percent.").

reasonable is a question for the Court, not the jury. *See Powell v. Home Depot U.S.A., Inc.,* 663 F.3d 1221, 1236–37 (Fed. Cir.2011) (citing *Cohesive Tech.*).

■ If the threshold objective prong of *Seagate* is met, "the patentee must also demonstrate that this objectively-defined risk (determined by the record developed in the infringement proceeding) was either known or so obvious that it should have been known to the accused infringer." *Seagate,* 497 F.3d at 1371. This is a subjective inquiry. *See Uniloc,* 632 F.3d at 1310.

If the objective requirement of the willfulness inquiry is not met, however, then there can be no finding of willfulness and the Court or the jury need not consider the subjective prong. *See Uniloc,* 632 F.3d at 1311; *DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.,* 567 F.3d 1314, 1337 (Fed.Cir.2009). Because the Court concludes that Accentra failed to carry its burden on the objective prong of the *Seagate* test with regard to both the '768 and '692 patents, it need not address the subjective prong.

### 2. '768 Patent

■ At trial, Staples presented testimony from its attorney Neil Ferraro, who provided Staples with the opinion that the accused staplers did not infringe the '768 patent. (*See* Trial Tr. at 37–64 (Day 5 Afternoon).) Ferraro testified that he informed Staples that he interpreted two limitations in the '768 patent in a way that demonstrated that the accused staplers did not infringe: (1) the accused staplers did not have automatically ejecting track assemblies; and (2) the accused staplers did not have sidewalls that completely surrounded the track pulls. (Trial Tr. at 43–47 (Day 5 Afternoon).)

With regard to the automatically ejecting track pull, claim 20 of the '768 patent covers a track pull that is "movable to extend rearward from the body in the open position of the stapler so that the track pull extends beyond the base sidewalls to be exposed outside the base sidewalls." (Cuomo Decl., Ex. 13 ('768 Patent) col. 12, ll. 20–24.) Ferraro explained that he interpreted this claim to require an automatically ejecting track pull because the '768 patent specification describes an automatically ejecting track pull as a feature of the covered invention. Because none of the accused staplers had that feature, but instead had "latch pins" that must be released in order to release the track pull, in his opinion, they could not infringe the '768 patent. (Trial Tr. at 44–45 (Day 5 Afternoon).)

Although the Court ultimately construed the term "movable" to allow but not require automatic ejection (Docket No. 87 at 23–24), Ferraro's opinion was a reasonable construction of the claims and Staples could have reasonably relied on it. The specification of the '768 patent explains that the claimed invention embodied an "improvement" of "an automatic opening mechanism for the staple-loading track," distinguishing it from the prior art, which required a three-step process for loading staples: "pivot the body up and around the base until the body is upside down, squeeze the arms of the track pull, and pull the track out." (Cuomo Decl., Ex. 13 ('768 Patent) col. 1, ll. 41–42, 50–54.) The specification further explains that the automatic feature of the claimed track pull "removes one full step in the staple loading process, and a portion of the next step." (*Id.,* col. 2, ll. 44–45.) As a result, "[f]or the staple loading operation, the present invention provides an automatic track opening function." (*Id.* col. 2, ll. 32–33; *see also id.,* col. 5, ll. 36–37 (explaining that Figure 4 of the patent "shows a typical prior art stapler without the automatic opening feature of the present invention.").)

Given the explanation in the specification, Ferraro's construction was reasonable and Staples could have reasonably relied on it to move forward with the accused staplers. Generally, there is a "fine line" between using the specification to construe claim terms and improperly importing claim limitations from the specification. *Abbott Labs. v. Sandoz, Inc.*, 566 F.3d 1282, 1288–89 (Fed.Cir.2009). Yet, "[w]here the specification makes clear that the invention does not include a particular feature, that feature is deemed to be outside the reach of the claims of the patent, even though the language of the claims, read without reference to the specification, might be considered broad enough to encompass the feature in question." *SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*, 242 F.3d 1337, 1341 (Fed.Cir. 2001). In *SciMed*, for example, the asserted claims covered a "balloon dilation catheter" with two passageways called "lumens." *Id.* at 1339. The parties agreed that only two arrangements of the "lumens" existed in the art: coaxial or adjacent. *Id.* Although the claims were not themselves limited to one arrangement, the court found that the specification expressly limited the claims to the coaxial arrangement for several reasons: the abstract of the patents described a coaxial arrangement; the written description discussed the disadvantages of the adjacent arrangement and the advantages of the coaxial arrangement; and the "Summary of Invention" portion of the patent described "all embodiments of the present invention" as having the coaxial arrangement. *Id.* at 1342–44.

Consistent with *SciMed*, Ferraro could have reasonably concluded that, despite the broad language of claim 20, the specification limited claim 20 to a stapler with an automatically ejecting track pull and excluded a stapler with only a manually ejecting track pull, given that the invention was described as having an automatically ejecting track pull as an advantage over the prior art. Thus, this construction could not have risen to clear and convincing evidence of an "objectively high likelihood" of infringement and the jury's contrary conclusion was not supported by substantial evidence.

With regard to the sidewalls that "surround" the track pull, claim 20 of the '768 patent contains the limitation that "the base sidewalls surround the track pull in the closed stapler position." (Cuomo Decl., Ex. 13 ('768 Patent), col. 12, ll. 15–16.) Ferraro testified that he construed the term "surround" to mean "hidden, and hidden means basically you can't see it," and since the sidewalls of the accused staplers exposed the track pull in the back, they could not infringe. (Trial Tr. at 44, 62–63 (Day 5 Afternoon).) This conclusion was apparently based on a comment in the specification that Figure 1, which is described as "one embodiment" of the invention "with track opening features shown in hidden view," shows "recess 127, rib 128, and track pull 60 are hidden inside sidewalls 23 of base 20 and indicated by dashed lines." (Cuomo Decl., Ex. 13 ('768 Patent), col. 3, ll. 32–33, col. 4, ll. 44–48.) Kenneth Zins, the Direct of Product Development in Staples' Brands Group, further testified that he and Ferraro interpreted "surround" to mean that

> obviously it's completely surrounding the lever that you push to eject it. So that's one thing that we made that when we were developing the stapler, we were keeping the back of the unit open, hence not surrounding, because it wasn't—you know, like, the sidewalls aren't coming around and touching each other. It was leaving an opening.

(Trial Tr. at 10 (Day 5 Afternoon).) At claim construction, the Court disagreed with Zins' and Ferraro's opinions and construed the term "surround" not to require

the track pull to be confined on all sides, based on the figures in the patent that show that the track pull is not confined so as to prevent any contact from the outside, as well as the dictionary definition of "surround." (Docket No. 87 at 20–21.)

Once again, the construction adopted by Staples was reasonable in light of the specification of the '768 patent. Although the figures in the patent show a track pull that was not surrounded on all sides by the sidewalls so as to prevent all contact from the outside, the specification at one point describes the track pull as "hidden," which could have been reasonably construed to mean that the track pull is hidden from view or contact from the outside. Given the somewhat vague claim language of "surround," which required the Court to synthesize the claim language, the figures, and the dictionary definition of "surround" to reach the proper construction, it was not unreasonable for Staples to reach a contrary conclusion. Thus, for this separate reason, the jury's conclusion that there was clear and convincing evidence that Staples willfully infringed the '768 patent was not supported by substantial evidence and must be set aside.

### 3. '692 Patent

As means-plus-function claims, the asserted claims for the '692 patent were subject to the jury's "intensely factual inquiry" of whether the structure of the safety mechanism in the accused staplers was "substantially equivalent" to the structures of the safety mechanism disclosed in the '692 patent. *DePuy Spine*, 567 F.3d at 1337. It was a close question in this case whether the accused safety designed

by Staples was substantially equivalent to the structures of the claimed safety, and, as a result, there could not have been clear and convincing evidence of willful infringement. *See id.; see also Uniloc*, 632 F.3d at 1310–11.

To support the jury's finding of infringement, Accentra's expert took the unusual approach of comparing two different structures disclosed in the '692 patent to the accused safety to find equivalence. (Trial Tr. at 5–14 (Day 2 Afternoon).) In contrast, Staples' expert testified that the safety mechanisms in the accused staplers were not equivalent, explaining that the two pieces of the accused mechanism that slide in different directions were substantially different from the structures in the patent that disclose essentially one-piece structures that pivot. (Trial Tr. at 105–17 (Day 5 Afternoon).) The jury was free to credit Accentra's expert and find equivalence, but "[t]he mere fact that the jury ultimately found equivalence does not diminish the difficulty of their task, which must be viewed objectively." *DePuy Spine*, 567 F.3d at 1337.[26] This case presented the jury with the difficult task of finding structural equivalence, and Staples could have reasonably concluded that its staplers did not have equivalent safety mechanisms. Therefore, the jury's conclusion that clear and convincing evidence of willful infringement existed was not supported by substantial evidence.

### F. Conclusion on Staples' Motion for Judgment as a Matter of Law

The Court GRANTS Staples' motion for judgment as a matter of law that the '709

---

**26.** Accentra argues that *DePuy Spine* is irrelevant because it dealt with the doctrine of equivalents, not equivalence under § 112, ¶ 6, which have different standards. The Court rejects Accentra's argument, however, because the only issue in this case was whether the accused safeties performed the identical function "in substantially the same way, with

substantially the same result," which is the same inquiry under either theory. *See Kemco Sales, Inc. v. Control Papers Co.*, 208 F.3d 1352, 1364 (Fed.Cir.2000) (explaining that the "'way' and 'result' prongs are the same under both the section 112, paragraph 6 and doctrine of equivalents tests").

patent is invalid as indefinite, so the jury's verdict of both infringement and willfulness and the jury's award of damages as to that patent are SET ASIDE.

The Court DENIES Staples' motion with regard to infringement of the '768 and '692 patents.

The Court DENIES Staples' request to exclude Newman's testimony on damages, but GRANTS IN PART the motion for judgment as a matter of law on damages because insufficient evidence existed to support the jury's overall award or apportionment among patents and devices. The Court DENIES Accentra's request for a new trial on damages. The Court has provided the parties with the maximum proper allocation of the reasonable royalty rate for the '768 and '692 patents supported by the evidence. The parties are ORDERED to calculate the amount of the reasonable royalty and provide the damages award in the final judgment.

The Court GRANTS Staples' motion with regard to the jury's finding of willful infringement of the '768 and '692 patents and SETS ASIDE the jury's willfulness finding as to those patents.

## II. ACCENTRA'S MOTION FOR ENHANCED DAMAGES AND ATTORNEY'S FEES (Docket No. 492)

### A. Enhanced Damages

Accentra has moved for enhanced damages based on the jury's finding of willful infringement of the three patents-in-suit. *See* 35 U.S.C. § 284. Because the Court has concluded that the '709 patent is invalid and the jury's verdict of willful infringement of the '768 and '692 patents was not supported by substantial evidence, Accentra is not entitled to enhanced damages and the Court DENIES Accentra's request. *See Seagate*, 497 F.3d at 1368 ("[A]n award of enhanced damages requires a showing of willful infringement.");

*see also DePuy Spine*, 567 F.3d at 1317 (same).

### B. Attorney's Fees and Expenses

 "The court in exceptional cases may award reasonable attorney fees to the prevailing party." 35 U.S.C. § 285. "Exceptional cases usually feature some material, inappropriate conduct related to the matter in litigation, such as willful infringement." *Revolution Eyewear, Inc. v. Aspex Eyewear, Inc.*, 563 F.3d 1358, 1372 (Fed.Cir.2009). Awarding attorney's fees involves a two-step inquiry: (1) the Court must first determine "whether there is clear and convincing evidence that a case is exceptional"; and (2) if so, the Court "must then determine in its discretion whether an award of attorney fees is justified." *Id.* at 1372–73. A case may be exceptional for the purpose of awarding attorney's fees even absent willful infringement based on "[l]itigation misconduct and unprofessional behavior." *Sensonics, Inc. v. Aerosonic Corp.*, 81 F.3d 1566, 1574 (Fed.Cir.1996).

On a single page of its motion, Accentra moves for attorney's fees, claiming that this case is indeed "exceptional," citing nothing but § 284 (enhanced damages) and § 285 (attorney's fees) as a legal basis and merely referring back to its arguments for enhanced damages as a factual basis. Accentra also provided no calculation of a reasonable fee award in the event the Court agrees that the case is exceptional, claiming simply that it would file an application if permitted by the Court. The motion is denied for several reasons.

 First, the Court previously ordered the parties to file *all* post-trial motions by the previously set deadlines. (Docket No. 484.) Accentra's failure to adequately brief the separate entitlement to attorney's fees and provide a calculation within those deadlines constitute grounds to deny the motion. *See* Local Rule 7–12.

Second, with regard to the '709 patent, Accentra is not entitled to attorney's fees because the Court has invalidated that patent and Accentra is no longer the prevailing party. *See* § 285.

Third, Accentra heavily relies on the jury's finding of willful infringement of the '768 and '692 patents to argue that it is entitled to attorney's fees, but the Court has set aside the jury's findings of willful infringement of those patents, removing willfulness as a basis for a finding the case exceptional. While Accentra may also cite litigation misconduct to justify finding the case exceptional, *see Sensonics*, 81 F.3d at 1575, its only arguable evidence of litigation misconduct is (1) Staples' initial citation to 20 prior references related to the '692 patent; (2) alleged "frivolous" threats of Rule 11 sanctions; and (3) advertising infringing products in 2011 catalogs, which, as outlined below, Staples was not prohibited from doing. None of this evidence clearly and convincingly demonstrates litigation misconduct sufficient to render the case exceptional.[27] Therefore, the Court DENIES the motion.

## III. ACCENTRA'S MOTION FOR PERMANENT INJUNCTION (Docket No. 491)

Following the verdict in its favor on infringement and validity, Accentra moved to permanently enjoin Staples

from making, using, offering to sell, or selling, or causing others to sell in the United States, or importing into the United States any stapler which is within the scope of any one of the asserted claims, including but not limited to the products which have been sold by Staples under the trade designations CX–1, DX–1, EX–5, and High Capacity, and all other products that are only colorably, nominally or insubstantially different from any one of these, and from otherwise inducing others to infringe and/or contributing to the infringement by others of any asserted claims during the respective terms of the asserted patents.

(Docket No. 491 (Proposed Order).)

Pursuant to 35 U.S.C. § 283, the Court "may grant injunctions in accordance with the principles of equity to prevent the violation of any right secured by patent, on such terms as the court deems reasonable." As the Supreme Court has instructed:

According to the well-established principles of equity, a plaintiff seeking a permanent injunction must satisfy a four-factor test before a court may grant such relief. A plaintiff must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and de-

---

27. In fact, the Court may consider actions of both sides in deciding whether a case is exceptional pursuant to § 285. *Sensonics*, 81 F.3d at 1575. Staples has pointed to questionable tactics by Accentra throughout this litigation, perhaps most notably the tactics discussed in the Court's November 17, 2010 Order finding that Accentra "clearly misrepresented the record" (Docket No. 409) and discussed in the Court's April 14, 2010 Order finding that Accentra took opposing positions, justifying the application of judicial estoppel to defeat its trademark infringement claims

(Docket No. 211 at 20). Likewise, even if the Court were to deem the case exceptional, it may nevertheless consider this misconduct in deciding whether attorney's fees are warranted. *See Motorola, Inc. v. Interdigital Tech. Corp.*, 121 F.3d 1461, 1468 (Fed.Cir.1997) (citing *Sensonics* and explaining that, "even if the district court had found the case exceptional, it would have enjoyed considerable leeway to deny fees in light of [the patentee's] own litigation misconduct."). The Court would exercise its discretion to deny Accentra an award of fees.

fendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.

*eBay, Inc. v. MercExchange, L.L.C.,* 547 U.S. 388, 391, 126 S.Ct. 1837, 164 L.Ed.2d 641 (2006). The decision to grant an injunction falls within the discretion of the district court. *Id.*

Staples has opposed Accentra's motion only on the ground that Accentra has failed to show irreparable harm, although it further argues that, if an injunction is granted, the language proposed by Accentra is too broad. Because Staples does not challenge Accentra's showing that its legal remedies are inadequate, the balance of hardships tips in its favor, and the public interest would not be disserved by an injunction, the Court assumes those elements are met. Nevertheless, the Court finds no irreparable harm here, which defeats Accentra's motion and obviates the Court's need to address Staples' challenge to the scope of the injunction.

Prior to *eBay,* the Federal Circuit had followed the categorical rule that irreparable harm was presumed upon a finding of infringement. *Robert Bosch, LLC v. Pylon Mfg. Corp.,* 659 F.3d 1142, 1148 (Fed. Cir.2011). The Supreme Court in *eBay,* however, "jettisoned the presumption of irreparable harm as it applies to determining the appropriateness of injunctive relief." *Id.* at 1149. Nevertheless, in determining whether irreparable harm exists, the Court may still consider "the fundamental nature of patents as property rights granting the owner the right to exclude." *Id.*

■ Accentra claims it will suffer irreparable harm if Staples is not prevented from further infringing Accentra's patents in part because in many patent cases "monetary damages alone are insufficient and will not make the patentee whole since they do not address the right to exclude." *Honeywell Int'l, Inc. v. Universal Avionics Sys. Corp.,* 397 F.Supp.2d 537, 546–47 (D.Del.2005). Accentra argues that Staples has continued to infringe the patents-in-suit because the accused staplers appeared on two of Staples' catalogs published in 2011—Staples Advantage 2011 Federal Government Catalog and Staples Advantage 2011 Full Line Catalog—which represent approximately 60% of Staples' catalog sales; Accentra was able to purchase the CX–1, EX–5, and High Capacity staplers at retail stores; and Accentra saw advertising for the accused staplers on a third-party website. (Robert Moses Decl. ¶¶ 5–9.) Accentra also contends that Staples is a "direct competitor" and, as a result of Staples' infringement, "Accentra lost market share, and that market share will never be recouped in the absence of an injunction preventing Staples from continuing infringement." (Mot. 4.) Accentra also complains that it cost more to litigate this case than the jury's (now set-aside) damages award, so the absence of an injunction would destroy the value of the patents-in-suit and encourage competitors to infringe the patents instead of paying royalties.

Staples responds by pointing out that it has stopped placing orders for infringing staplers and is merely selling through the units it had on hand for which it either has already paid a royalty or as to which it is willing to provide an accounting. Staples is also transitioning to a new technology that undisputedly does not infringe Accentra's patents. Further, Staples argues that no evidence supports Accentra's claims that it has suffered an impaired market share or price erosion due to infringement; in fact, according to Staples, the evidence shows the opposite: Staples and Accentra have different target customers, so Staples could not have eroded Accentra's market share by infringing, and Accentra was a successful company during the period of infringement.

The Court agrees with Staples that Accentra has not demonstrated irreparable harm justifying an injunction. First, Staples' Senior Vice President of the Staples Brands Group attested under penalty of perjury that Staples stopped placing orders for the infringing staplers on December 28, 2010,[28] and, for 17,860 units already ordered and in transit, Staples transshipped them to Canada. (D'Angelo Decl. ¶¶ 4–5.) Although Staples also added 22,050 units to its inventory between the jury verdict and the hold on orders (*id.* ¶ 7), it is entitled to sell its remaining inventory of the infringing staplers, since the jury's award already included a royalty on these devices and Staples has offered to conduct an accounting for the remaining units in inventory or sold after the jury's verdict. *See Amstar Corp. v. Envirotech Corp.*, 823 F.2d 1538, 1549 (Fed.Cir.1987) ("Having been awarded full compensation for the making and using of existing infringing thickeners, therefore, Amstar is not entitled to enjoin their use."); *Stickle v. Heublein, Inc.*, 716 F.2d 1550, 1563 (Fed.Cir. 1983) ("Upon receiving full compensation for the making and using of existing infringing fryers, appellees are not thereafter entitled to enjoin use of such fryers."). Because Staples can sell through its existing inventory, Accentra's arguments about the accused staplers appearing in Staples' 2011 catalogs and appearing for sale carry little weight.

Second, Staples has presented substantial evidence that it is moving away from Accentra's patented technology to staplers that do not use a power spring or a rear-loading track pull, which undisputedly would not infringe Accentra's patents. (D'Angelo Decl. ¶ 9.) Staples further attests that it does not intend to attempt to circumvent the jury's verdict by reworking the spring-powered designs. (*Id.* ¶ 10.) Thus, there appears to be very little risk that Staples will continue to order and sell infringing staplers.

Third, Accentra has not shown any actual impact on its market share. *See Robert Bosch*, 659 F.3d at 1154 (noting that the patentee bears the burden of showing lost market share, although it need not do so with direct evidence). Because Accentra sells to retailers like Office Depot and OfficeMax, whereas Staples is a retailer that sells directly to consumers, Staples' sales would presumably have little direct effect on Accentra. And even if there was some potential effect, there was little evidence that it actually occurred in this case. Staples sold 1.1 million units of the accused staplers during the pendency of this lawsuit (Trial Tr. at 54 (Day 5 Morning)), which could have had a great impact on Accentra's profits, yet the jury rejected Accentra's request for lost profits. Indeed, Accentra's Chief Financial Officer Robert Moses testified at trial that Accentra was successful, holding 82% of the market share for spring-powered staplers. (Trial Tr. at 66 (Day 4 Afternoon); *see also* Trial Tr. at 48 (Day 2 Morning) (stating that Accentra "continue[s] to keep growing the category as—as all the other category members continue to have declines").) There is nothing to substantiate Accentra's claim that its market share has been eroded by Staples' sales of infringing staplers.[29]

---

**28.** Although not mentioned by Accentra, Staples informed Accentra as early as February 2011 that it had cancelled all orders since January 1. (O'Connor Decl., Ex. 1.)

**29.** Contrary to Accentra's argument, there is nothing to suggest that Staples intends to engage in a "bait-and-switch" system, where-by Staples offers the infringing staplers for sale, only to substitute non-infringing products when orders are placed. *Cf. Am. Seating Co. v. USSC Group, Inc.*, 514 F.3d 1262, 1270 (Fed.Cir.2008) (awarding lost profits as damages when the infringer offered the infringing

Finally, the Court rejects Accentra's position that an injunction should issue because the injunction will have little negative impact on Staples if Staples is telling the truth about its intent not to infringe in the future. This approach is logically flawed because the opposite could be equally true: if Staples is telling the truth about not intending to infringe in the future, then an injunction is unnecessary. Before the *eBay* decision, the Court might well have adopted Accentra's "better-safe-than-sorry" approach because an injunction in favor of the patentee was considered a matter of course once infringement and validity were found. *See, e.g., W.L. Gore v. Garlock, Inc.,* 842 F.2d 1275, 1281–82 (1988). With the Court's rejection of this categorical approach in *eBay,* however, Accentra was required to put forth actual evidence of irreparable harm, which it has failed to do. *See eBay,* 547 U.S. at 393–94, 126 S.Ct. 1837. Thus, Accentra's motion for a permanent injunction is DENIED.

## IV. ACCENTRA'S MOTION FOR ACCOUNTING, PRE- AND POST-JUDGMENT INTEREST, AND COSTS (Docket No. 490)

Accentra moves for an accounting, pre- and post-judgment interest, and costs. Staples has agreed to provide an accounting for the 22,050 infringing units that were added to its inventory after the verdict and not included in the jury's damages award. Staples also does not oppose the request for post-judgment interest and does not oppose the request for costs, provided the costs awarded are based only on the issues on which Accentra prevailed. It opposes any award of prejudgment interest, but also provides a detailed calculation of interest, should prejudgment interest be awarded.

In light of the Court's other rulings, the Court cannot fix at this time the precise amount of interest, costs, or additional damages based on an accounting, and instead leaves the calculation to the parties to be included in a final judgment. The Court can rule on three issues now: the scope of the accounting required; the availability of pre-judgment interest and the method to calculate that interest; and the award of post-judgment interest. Thus, the motion is GRANTED, with the amounts to be fixed by the parties in the final judgment.

### A. Accounting

Staples has appropriately agreed to provide an accounting for infringing units it added to inventory after the jury's verdict (which were therefore not included in the jury's damages award). Based on Staples' evidence and representations, Staples added 22,050 units to its inventory between November 27, 2010—the last date for which evidence of sales was offered at trial—and December 28, 2010—the date Staples stopped placing orders for the infringing products. The Court ORDERS that an accounting be conducted for these units. *See* 35 U.S.C. § 284 (providing that the Court "shall award the claimant damages adequate to compensate for infringement"); *Ecolab, Inc. v. FMC Corp.,* 569 F.3d 1335, 1353 n. 5 (Fed.Cir.2009) (approving of accounting "to calculate and award damages for post-verdict sales"), *amended on other grounds,* 366 Fed.Appx. 154 (Fed.Cir.2009) (unpublished).

Contrary to Accentra's suggestion, Accentra is *not* entitled to an accounting for the sales of infringing staplers that were in Staples' inventory before November 27, 2010, even if sold after that date, because the jury already accounted for royalties on those units. (O'Connor Decl., Ex. 4; Trial Tr. at 58 (Day 5 Morning).) Staples is

---

product for sale, but fulfilled orders with a non-infringing product).

obligated only to pay a royalty on each unit once, and then it is free sell the units on which a royalty was paid. *See Amstar,* 823 F.2d at 1549; *Stickle,* 716 F.2d at 1563. However, if for some reason Staples adds more infringing units to inventory (which the Court assumes will not be the case, given Staples' representations in opposing Accentra's motion for an injunction), Accentra would obviously be entitled to an accounting for those units as well.

## B. Pre–Judgment Interest

■ "In patent infringement cases, 'prejudgment interest should be awarded under § 284 absent some justification for withholding such an award.'" *Telcordia Techs., Inc. v. Cisco Sys., Inc.,* 612 F.3d 1365, 1378 (Fed.Cir.2010) (quoting *Gen. Motors Corp. v. Devex Corp.,* 461 U.S. 648, 657, 103 S.Ct. 2058, 76 L.Ed.2d 211 (1983)); *Crystal Semiconductor Corp. v. TriTech Microelects. Int'l, Inc.,* 246 F.3d 1336, 1361 (Fed.Cir.2001) ("In *General Motors,* the Supreme Court made prejudgment interest the rule, not the exception."). Staples offers no substantive reason why prejudgment interest should not be awarded in this case; Staples argues only that Accentra failed to cite legal authority to support this request. While the Court does not condone Accentra's failure to support its motion, it is not a justification to deny an award. *See Crystal Semiconductor,* 246 F.3d at 1361–62 (explaining that, "[a]ny justification for withholding the award, according to the Supreme Court, must have some relationship to the award of prejudgment interest itself," such as undue delay that caused interest to escalate).

■ In determining the applicable interest rate, the Court applies Ninth Circuit law. *Transmatic, Inc. v. Gulton Indus.,* *Inc.,* 180 F.3d 1343, 1348 (Fed.Cir.1999). In the Ninth Circuit, the applicable interest rate is set by 28 U.S.C. § 1961(a), unless "substantial evidence" is offered that a different rate should apply. *W. Pac. Fisheries, Inc. v. SS President Grant,* 730 F.2d 1280, 1289 (9th Cir.1984). Accentra urges the Court to adopt a 4.5% interest rate compounded monthly, based on its Chief Operating Officer Robert Moses's declaration that this is the rate applied to Accentra's borrowing of funds. (Robert Moses Decl. ¶ 16.) Other than this summary comment by Robert Moses, Accentra offers no evidence—let alone "substantial evidence"—to demonstrate that this rate is necessary to fully compensate Accentra for Staples' infringement. *See Crystal Semiconductor,* 246 F.3d at 1361 (explaining that prejudgment interest "serves to make the patentee whole because the patentee also lost the use of its money due to infringement"). To the contrary, Accentra's cost for borrowing money potentially accounted for many business risks beyond the instant case, so it bears little relationship to Accentra's full compensation for Staples' infringement. Absent substantial evidence to the contrary, the Court will apply the interest rate set by § 1961(a), compounded annually as provided by § 1961(b).

■ The Court accepts Staples' method of calculating prejudgment interest as set out in its opposition brief, although it will leave the actual calculations to the parties.[30] First, the period of prejudgment interest began on the date of infringement and ends on the date of entry of judgment. *See Gen. Motors,* 461 U.S. at 656, 103 S.Ct. 2058 (noting that the interest runs "between the time of infringement and the date of the judgment").[31] Second,

---

**30.** Although Accentra did not elicit evidence at trial on the specific dates when the accused units were sold, the Court finds that Staples' methodology fairly calculates prejudgment in-

terest so as to compensate Accentra for the use of the money prior to judgment.

**31.** Prejudgment interest applies only to compensatory damages, not punitive or enhanced

the damages award must be allocated per each product and per each of the valid and infringed '768 and '692 patents, as demonstrated by the charts provided by Staples. (Opp. 13–14.) Third, the total damages allocated to each accused device must be divided by three to approximate sales each year of the three years of infringement by each device; then those amounts are multiplied for each patent by the prevailing interest rate each year (3.42% in 2008; 0.40% in 2009; and 0.41% in 2010), by using a compounding methodology as set out in the charts provided by Staples. (Opp. 15–16.)

### C. Post–Judgment Interest

■ Staples does not oppose post-judgment interest, which is calculated pursuant to § 1961(a) and runs from the date of entry of judgment until the judgment is paid in full. Thus, the Court awards post-judgment interest, to be calculated after judgment is entered.

### V. ACCENTRA'S MOTION FOR OR-DER RE FINDINGS OF FACT AND CONCLUSIONS OF LAW FOR INEQUITABLE CONDUCT (Docket No. 489)[32]

Accentra moves for the Court to adopt the jury's findings that Staples failed to prove by clear and convincing evidence that named inventor Joel Marks and prosecution attorney Paul Feng withheld material information from the PTO during the prosecution of the '709 patent with the

intent to deceive the PTO. (Docket No. 472 at 4.) The Court adopts the jury's factual findings on these issues and thus, Staples' affirmative defense of inequitable conduct fails. Accentra's motion is GRANTED.

### A. Legal Standard

■ Following trial in this case, the Federal Circuit issued an en banc decision that clarified and reworked the standards for proving inequitable conduct. *See Therasense, Inc. v. Becton, Dickinson & Co.,* 649 F.3d 1276 (Fed.Cir.2011) (en banc).[33] Proof of inequitable conduct still requires clear and convincing evidence of intent to deceive and materiality. *Id.* at 1287. For intent, the accused infringer must prove by clear and convincing evidence that the patentee acted "with specific intent to deceive the PTO," and gross negligence under a "should have known" standard is not enough. *Id.* at 1290. In particular, " '[i]n a case involving nondisclosure of information,' " as in this case, " 'clear and convincing evidence must show that the applicant *made a deliberate decision* to withhold a *known* material reference.' " *Id.* (emphasis in original). "In other words, the accused infringer must prove by clear and convincing evidence that the applicant knew of the reference, knew that it was material, and made a deliberate decision to withhold it." *Id.*

■ The court rejected the prior "sliding scale" approach, "where a weak showing of intent may be found sufficient based

---

damages. *See Beatrice Foods Co. v. New England Printing and Litho. Co.,* 923 F.2d 1576, 1580 (Fed.Cir.1991). Because no enhanced damages are awarded in this case, any prejudgment interest necessarily springs only from compensatory damages.

32. The Court did not hear oral argument on this motion at the May 16, 2011 hearing. The Court finds that oral argument is unnecessary. Fed.R.Civ.P. 78; Local Rule 7–15.

33. Staples' claim of inequitable conduct is directed only to the '709 patent. Even though the asserted claims in the '709 patent are invalid as indefinite, the inequitable conduct claim is not moot because inequitable conduct renders the entire patent unenforceable, not just the asserted claims. *Therasense,* 649 F.3d at 1288 ("Unlike validity defenses, which are claim specific ... inequitable conduct regarding any single claim renders the entire patent unenforceable.").

on a strong showing of materiality, and vice verse," and reaffirmed that the a court may not infer intent to deceive from materiality alone, so "[p]roving that the applicant knew of a reference, should have known of its materiality, and decided not to submit it to the PTO does not prove specific intent to deceive." *Id.* While specific intent can be proved by circumstantial evidence, "to meet the clear and convincing evidence standard, the specific intent to deceive must be 'the single most reasonable inference able to be drawn from the evidence.'" *Id.* In other words, "the evidence 'must be sufficient to *require* a finding of deceitful intent in light of all the circumstances'"; "when there are multiple reasonable inferences that may be drawn, intent to deceive cannot be found." *Id.* at 1290–91 (emphasis in original). And the patentee need not offer a good faith explanation unless the accused infringer meets the threshold burden of intent to deceive by clear and convincing evidence because "[t]he absence of a good faith explanation for withholding a material reference does not, by itself, prove intent to deceive." *Id.* at 1291.

As to materiality, the court adopted a "but-for" materiality test: "[w]hen an applicant fails to disclose prior art to the PTO, that prior art is but-for material if the PTO would not have allowed a claim had it been aware of the undisclosed prior art." *Id.* at 1291. "Hence, in assessing the materiality of a withheld reference, the court must determine whether the PTO would have allowed the claim if it had been aware of the undisclosed reference," which is determined by using the preponderance of evidence standard and by giving claims their broadest reasonable construction. *Id.* at 1291–92.

Finally, as before *Therasense,* if the accused infringer can carry its heavy threshold burden to show both materiality and

intent to deceive, "the district court must weigh the equities to determine whether the applicant's conduct before the PTO warrants rendering the entire patent unenforceable." *Id.* at 1287.

There remains the issue of applying *Therasense* to this case, which was submitted to the jury under the pre-*Therasense* standard in order to obtain the jury's advisory findings on the threshold issues of materiality and intent. (Docket No. 460, Tentative Closing Instructions at 88–92.) In assessing the threshold showing of materiality and intent, the Court may consider the jury's advisory findings. *See Hebert v. Lisle Corp.,* 99 F.3d 1109, 1114 (Fed.Cir.1996); *see also Am. Calcar, Inc. v. Am. Honda Motor Co.,* 651 F.3d 1318, 1334 (Fed.Cir.2011). There is value to advisory jury findings on these issues, particularly in areas of jury expertise like the credibility of witnesses' denials of the intent to deceive the PTO, which Staples even recognized when it advocated that these issues be tried to the jury, rather than bifurcated into a court trial. (Docket No. 350 at 2 ("Staples believes that the issues of materiality and intent, which underlie inequitable conduct, are the types of issues that juries are particularly well suited to resolve and that it would make sense to submit these issues to the jury in this case."); Docket No. 353.) *Cf. Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 150, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000) ("'Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge.'"). Nevertheless, the Court must itself make the findings of fact and conclusions of law on inequitable conduct. *See Am. Calcar,* 651 F.3d at 1334.

Although *Therasense* was decided after the jury issued its advisory findings, the jury's findings are still useful here be-

cause, if the evidence could not convince the jury to find materiality and intent based on the more lenient pre-*Therasense* standard, then certainly that same evidence could not convince the jury to find materiality and intent under the stricter *Therasense* standard. And of course, *Therasense* does not impact the usefulness of the jury's implicit finding that the witnesses' denials of wrongdoing were credible, which is important under either standard. Thus, the Court considers the issue of inequitable conduct within these parameters.

### B. Discussion

 Staples claims that Marks and Feng committed inequitable conduct by failing to disclose to the PTO physical samples of two prior art staplers—the Black & Decker EasyShot stapler (the "EasyShot") and the Novus B7–A (the "Novus")—with an intent to deceive the PTO. This was true, according to Staples, even though Marks and Feng disclosed the packaging for the EasyShot and disclosed U.S. Patent No. 5,356,063 (the "Perez patent"), which was embodied by the Novus physical sample. Consistent with the jury's findings, the Court finds that Staples failed to show by clear and convincing evidence that Marks and Feng withheld this information from the PTO with the specific intent to deceive or that this information would have been "but-for" material to patentability of the '709 patent.

Both Marks and Feng testified unequivocally at trial that they did not withhold the physical samples of the Novus and EasyShot staplers with the intent to deceive the PTO. (Trial Tr. at 73–78 (Day 4 Morning) (Feng Testimony); Trial Tr. at 104–05 (Day 4 Morning) (Marks Testimony).) The jury implicitly credited their testimony on this point, and the Court accepts that finding. *See Reeves*, 530 U.S. at 150, 120 S.Ct. 2097. Their denials were also credible in light of the facts adduced

at trial, which do not support the inference that they intended to deceive the PTO. For example, Marks and Feng obviously did not intend to conceal the existence of the EasyShot from the PTO—they disclosed its packaging. And they disclosed the packaging because they thought its detachable base and flexible sidewalls could be relevant to some of the claims in the '709 patent. (Trial Tr. at 76–77 (Day 4 Morning); *id.* at 94.) They did not believe, however, that the EasyShot was relevant to the claims directed to handle travel. So, while Marks admitted at trial that the handle travel distance for the EasyShot could not be measured from the packaging alone (*id.* at 127–28), he did not think the patent examiner would need to take that measurement (*id.* at 129–30).

As for the Novus stapler, both Marks and Feng testified that handle travel distance could be measured from the Perez patent disclosure—which the Novus stapler embodies—so they *did not believe* at the time that disclosure of the physical sample was necessary. (*Id.* at 90–92, 138–140.) Staples attacks their beliefs with evidence that, during the prosecution of an application that issued as U.S. Patent No. 7,748,589 (the "'589 patent'"), which was a continuation of the '709 patent with almost identical handle-travel limitations, Feng suggested that the examiner could *not* measure the handle travel distance from the Perez patent alone. The examiner had originally rejected claims 2 and 3 in the '589 patent application based in part on handle and striker travel dimensions apparently obtained from dimensionless drawings in the Perez patent. (Cuomo Decl., Ex. 13 (Tr. Ex. 709) at 123 (March 17, 2009 Office Action).) In response, Feng argued that this measurement was not accurate because "the Perez drawings are not drawn to scale and no dimensions are given" and the examiner's measurement should not have been based on "the

Perez disclosure, which lacks dimensions, magnitudes, scale drawings, etc." (*Id.* at 147 (June 29, 2009 Pre–Appeal Brief).)

At trial, Feng explained that he did not believe one could infer dimensions from the Perez drawings by themselves, but he and Marks inferred dimensions from both the drawings and the specification. (Trial Tr. at 90 (Day 4 Morning).) When cross-examined, Feng claimed that the language he used in this brief before the PTO involving the '589 patent application was therefore "sloppy" and "loose" and that "if you read this entire brief, you'll see that it's pretty consistent that I was talking about the drawings that the examiner was looking at." (Trial Tr. at 91 (Day 4 Morning).) Indeed, the brief went on to explain how Marks was able to infer travel distances using other parts of the Perez patent. (Cuomo Decl., Ex. 13 at 164–65 (June 29, 2009 Pre–Appeal Brief).)

Under *Therasense*, these facts do not come close to clear and convincing evidence "requir[ing]" the " 'the single most reasonable inference' " of an intent to deceive by withholding physical examples of either the EasyShot or Novus staplers. 649 F.3d at 1290.

The evidence at trial also does not compel an inference that the physical samples of the Novus and EasyShot staplers were "but-for" material to the claims in the '709 patent. Prosecuted by Feng and having Marks named as the inventor, the '589 patent had almost identical handle travel limitations as the '709 patent and was prosecuted before the same examiner who examined the '709 patent. (Trial Tr. at 81–84.) During the prosecution of that patent application, Marks and Feng disclosed the physical examples of the Novus and EasyShot staplers, yet the examiner based the rejections of the '589 patent application on the Perez patent and eventually allowed the '589 patent over the Perez patent, suggesting that the samples

were cumulative and not material to the same claims in the '709 patent. (*Id.* at 84–84.) The jury was also presented with the physical samples of the Novus and EasyShot and found the '709 patent valid, undermining any claim that these references were material to the asserted claims in the '709 patent. Thus, the physical samples would not have been "but-for" material to the issuance of the '709 patent, had Marks and Feng submitted them during prosecution of that patent. *Therasense*, 649 F.3d at 1291.

Therefore, the Court GRANTS Accentra's motion to accept the jury's findings of no materiality or intent and GRANTS judgment to Accentra that the '709 patent is not unenforceable due to inequitable conduct.

## CONCLUSION

The Court GRANTS IN PART and DENIES IN PART Staples' Motion for Judgment as a Matter of Law. (Docket No. 487.) The Court GRANTS judgment to Staples that the '709 patent is invalid as indefinite, and the jury's verdict of willful infringement of that patent and award of damages is SET ASIDE. The Court DENIES judgment to Staples on infringement of the '768 and '692 patents. The Court GRANTS IN PART Staples' motion with respect to damages, and has provided the parties with the proper allocation of the reasonable royalty rate for the '768 and '692 patents, to be calculated and included in a final judgment. The Court DENIES Accentra's request for a new trial on damages. The Court GRANTS judgment to Staples of no willful infringement of the '768 and '692 patents.

The Court DENIES Accentra's motion for enhanced damages and request for attorney's fees. (Docket No. 492.)

The Court DENIES Accentra's motion for a permanent injunction. (Docket No. 491.)

The Court GRANTS IN PART and DENIES IN PART WITHOUT PREJUDICE Accentra's motion for an accounting, pre- and post-judgment interest, and costs. (Docket No. 490.)

The Court GRANTS Accentra's motion to adopt the jury's findings of no intent and materiality sufficient to support a finding of inequitable conduct, and the Court GRANTS judgment to Accentra that the '709 patent is not unenforceable due to inequitable conduct.

**The Court ORDERS the parties to meet and confer and lodge a proposed judgment consistent with this Order and the affirmed portions of the jury's verdict no later than 30 days from the date of this Order.**

**IT IS SO ORDERED.**

